**DAVID R. McGEORGE CAR CO., INC., Appellee,**

v.

**LEYLAND MOTOR SALES, INC., Appellant.**

**DAVID R. McGEORGE CAR CO., INC., Appellant,**

v.

**LEYLAND MOTOR SALES, INC., Appellee.**

Nos. 73–2114, 73–2115.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1974.

Decided Oct. 1, 1974.

John R. Schoemer, Jr., New York City, (Douglas C. Fairhurst, Townley, Updike, Carter & Rodgers, New York City, and A. R. Bowles, II, Bowles & Boyd, Richmond, Va., on brief) for appellant in No. 73–2114 and for appellee in No. 73–2115.

Jerry S. Cohen, Washington, D. C., (Herbert E. Milstein, Michael D. Hausfeld, Washington, D. C., Douglas W. Conner and Conner & Conner, Richmond, Va., on brief), for appellee in No. 73–2114 and for appellant in No. 73–2115.

Before HAYNSWORTH, Chief Judge, and CRAVEN and FIELD, Circuit Judges.

FIELD, Circuit Judge:

David R. McGeorge Car Co., Inc., (McGeorge) brought this action against Leyland Motor Sales, Inc., (Leyland) and its parent corporation, British Leyland Motors, Inc.,[1] alleging that an arrangement in the sale of automobiles constituted bad faith dealing in violation of the Dealers Day in Court Act (DDICA), 15 U.S.C. § 1222, and was

---

1. British Leyland Motors, Inc., the parent corporation, was subsequently dismissed as a party defendant.

also in violation of federal antitrust statutes. The district court awarded relief under the DDICA and the Robinson-Patman Act for Leyland's deliberate shortage of one line of automobiles to McGeorge in an attempt to coerce its acceptance of additional lines. However, the district court refused to grant relief under either the DDICA or the antitrust acts for British Leyland's refusal to renew McGeorge's dealership, after the latter had declined the additional lines of automobiles. Both parties have appealed.

David R. McGeorge Car Co., Inc., was founded in 1960 by David R. McGeorge who managed the company until an illness in February of 1970 when his son Robert assumed control. Throughout the 1960's McGeorge sold three lines of automobiles, Mercedes-Benz from 1960 on, Triumph from 1963 to mid-1970, and Toyota continuously from 1968. None of the cars was competitive with the other since Mercedes-Benz sold for approximately $6000, Triumph for $2800 and Toyota for $2000. McGeorge's dealership agreement for the sale of Triumphs, signed originally with the Standard Triumph Motor Company in 1963, was renewed for two years in July, 1968, with Leyland Motor Sales, Inc., the northeast regional distributor for British Leyland Motors, Inc., which had acquired the Standard Triumph Motor Company.

In addition to its acquisition of Triumph, in April of 1967 British Leyland purchased The Rover Company, Ltd., manufacturers of Land Rover, a cross-country vehicle, and Rover, a luxury sedan in the Mercedes and BMW class. Shortly thereafter British Leyland initiated a policy designed to couple the high consumer appeal of Triumph with its newly acquired Rover, and Triumph dealers throughout the United States were presented with a proposal that in order to continue selling Triumphs they should begin selling Rovers and Land Rovers. At the time of the proposal, Triumphs, already in high demand, be-

gan experiencing shortages as a result of labor problems in England. British Leyland was then in the position of allocating an item in high demand and short supply among dealers who had been presented with British Leyland's offer of Rover and Land Rover. McGeorge declined the proposal based upon its assessment that Rover had little sales potential and the fact that Rover would compete with Mercedes-Benz which it was already selling.

In October 1969, Leyland Motor Sales, Inc., began cutting McGeorge's supply of Triumphs in an attempt to persuade it to reconsider the Rover and Land Rover proposal. Whereas the supply of Triumphs was off 10 to 20 percent nationally in 1969, McGeorge's supply was cut by 50 percent in that year and an additional 16 percent in 1970. Conversely, other Virginia Triumph dealers who had accepted Rover and Land Rover experienced only a 25 percent cutback in 1969 and increases of up to 93 percent in 1970. When in May of 1970 it became clear that McGeorge's rejection of Rover and Land Rover was final, Leyland Motor Sales, Inc., recommended to British Leyland that McGeorge's Triumph dealership not be renewed upon its normal expiration in July, 1970. The dealership was not renewed and in September of 1970 David R. McGeorge brought this action.

## I

In awarding McGeorge relief under the Robinson-Patman Act the district court, relying on Centex-Winston Corp. v. Edward Hines Lumber Co., 447 F.2d 585 (7 Cir. 1971), held that Leyland's "delivery" of a short supply of Triumphs to McGeorge was a discriminatory allocation of services proscribed by § 2(e) of the Act[2] which provides that

(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing,

2. 15 U.S.C. § 13(e).

by contracting to furnish or furnishing, or by contributing to the furnishing of, *any services or facilities* connected with the processing, handling, sale or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms. (Emphasis added).

In *Centex-Winston,* the Seventh Circuit held that a wholesaler's delivery of lumber to a builder consistently later than contractually specified dates, while delivering lumber orders of the builder's competitors on time, was discrimination among purchasers in the furnishing of a service, i.e., delivery connected with the resale of a commodity.

■ We are unable to agree with the conclusion of the district court for even if we were to accept the Seventh Circuit's characterization of delivery as a "service,"[3] factual distinctions in the present case render *Centex-Winston* inapposite. Unlike *Centex-Winston* in which the defendant contracted to deliver the commodities, the dealership agreement involved here required McGeorge to accept delivery of Triumphs at their point of arrival in Baltimore or engage independent transporters at its own risk. The record reveals that McGeorge frequently sent individual em-

ployees to Baltimore for the express purpose of driving new cars back to Richmond. The district court's reliance on *Centex-Winston* was thus misplaced. That Leyland was discriminating in the allocation of Triumphs, the commodity itself, as opposed to a service or facility connected with the resale of the commodity is obvious, and in our opinion places this case beyond the pale of Robinson-Patman. We conclude that Robinson-Patman was an improper basis for the judgment below.

## II

■ We do agree with the district court that Leyland's conduct in "shorting" McGeorge in the delivery of Triumphs in an attempt to compel it to accept the Rover and Land Rover lines constituted a lack of good faith on its part under the Dealers Day in Court Act.[4] The DDICA, which has been described as "a fringe area of antitrust law * * * designed in part to supplement [those] laws,"[5] requires the manufacturer to act in good faith in carrying out the provisions of the franchise as well as in its termination, cancellation or non-renewal. Good faith, which is defined in Section 1(e) of the Act,[6] has been construed literally by the

3. For the contrary view see Rowe, Pricing and the Robinson-Patman Act, 41 Antitrust L.J. 98, 109 (1972).

4. § 1222. Authorization of suits against manufacturers; amount of recovery; defenses

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be

barred from asserting in defense of any such action the failure of the dealer to act in good faith. Aug. 8, 1956, c. 1038, § 2, 70 Stat. 1125; 15 U.S.C. § 1222.

5. Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 561 (2 Cir. 1970).

6. § 1221. *Definitions*
As used in this chapter—
  *   *   *   *   *
(e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith. Aug. 8, 1956, c. 1038, § 1, 70 Stat. 1125; 15 U.S.C. § 1221(e).

courts and must be determined in the context of actual or threatened coercion or intimidation, Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608 (7 Cir. 1972); American Motor Sales Corporation v. Semke, 384 F.2d 192 (10 Cir. 1967), and it now appears to be settled that a manufacturer's coercive attempt to force unwanted automobiles on a dealer constitutes bad faith dealing for purposes of the Act. American Motor Sales v. Semke, *supra*, and *see* House Report No. 2850, 84th Cong.2d Sess. 9, 3 U.S.Code Cong. & Admin.News, pp. 4596, 4603 (1956).[7] We think it reasonable to read into McGeorge's dealership agreement an implied provision that in the event of a strike or casualty occasioning a reduction in the number of Triumphs exported to this Country the manufacturer would treat its dealers ratably and equitably. The district court's finding of coercion in the cutback of Triumphs is fully supported by the evidence, and the DDICA gives McGeorge a remedy for the loss of profits suffered by it as a result of this discriminatory action taken by Leyland in an effort to compel McGeorge to make a concession which was not required of it under the terms of its dealership.

■ The more troublesome question on this aspect of this appeal is whether the district court was correct in holding that the non-renewal of McGeorge's dealership did not also constitute bad faith dealing under the Act. The district court concluded that Leyland's decision not to renew was made after the failure of the coercive measures and not as a continuing part thereof, and that although Leyland had acted in bad faith with respect to the shortages, the refusal to renew was based upon a rational business decision. We are inclined to agree with this conclusion. The evidence clearly demonstrates that it was in the best interests of Leyland to market its Triumph and Rover lines in the United States through dual dealerships and, indeed, that such dual dealerships were its only hope of improving the rather disappointing market performance of the Rovers. When McGeorge declined to accept such a dual dealership Leyland had a perfectly legitimate reason to refuse to renew its Triumph franchise. With no further contractual obligations to McGeorge, Leyland's decision to obtain a dealer who would carry out its marketing policy with respect to both Triumphs and Rovers was based on sound business considerations free from the "coercion or intimidation" proscribed by the Act.

■ The plaintiff contends, however, that Leyland's conduct in its efforts to coerce McGeorge in the 1969–70 period fatally infected its 1970 decision to transfer the dual line to another dealer. To accept this charge of continuing bad faith, however, would permanently preclude Leyland from making any change in its marketing procedures at any time in the future and, in effect, the bond between dealer and manufacturer would be indissoluble. "A franchise is not a marriage for life,"[8] and the Act does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation or who refuses to carry out its legitimate marketing policies. "Nor does the [Act] curtail the manufacturer's right to cancel or not renew an inefficient or undesirable dealer's franchise."[9] It has been held that under the Act a manufacturer is not precluded

---

7. "The existence of coercion or intimidation depends upon the circumstances arising in each particular case and may be inferred from a course of conduct. For example, manufacturer pressure, direct or indirect, upon a dealer to accept automobiles, parts, accessories, or supplies which the dealer does not need, want, or feel the market is able to absorb, may in appropriate instances constitute coercion or intimidation.

8. Bateman v. Ford Motor Company, 302 F.2d 63, 66 (3 Cir. 1962).

9. H.R.Rep. No. 2850, 84th Cong.2d Sess. 9, U.S.Code Cong. & Admin.News, pp. 4596, 4603 (1956).

from terminating or refusing to renew the franchise of a dealership which has not provided adequate sales representatives, [10] adequate facilities for the conduct of the dealership, [11] or does not meet reasonable sales objectives.[12] We discern no significant difference between those cases and the present one where the evidence supports the conclusion that Leyland acted in the reasonable belief that its business welfare required a dual dealership arrangement.[13]

## III

On its cross-appeal McGeorge contends that the shortage in the delivery of Triumphs and the subsequent refusal by Leyland to renew its dealership were merely progressive stages in a scheme to enforce a tie-in of Triumphs and Rovers, and that Leyland's conduct in this respect violated both Section 3 of the Clayton Act [14] and Section 1 of the Sherman Act [15] under the *per se* doctrine of International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The district judge rejected this contention of McGeorge primarily upon his finding that Leyland's conduct did not impede or suppress competition nor did the proposed arrangement preclude McGeorge from continuing its representation of Mercedes-Benz or other motor cars competitive with Rover. We agree with this conclusion of the district court.

■■ The "perceptible pattern of illegality" in "tying cases" was stated in Times-Picayune v. United States, 345 U.S. 594, 608–609, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953):

> "When the seller enjoys a monopolistic position in the market for the 'tying' product, *or* if a substantial volume of commerce in the 'tied' product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening of competition is inferred. And because for even a lawful monopolist it is 'unreasonable, *per se,* to foreclose competitors from any substantial market', a tying arrangement is banned by § 1 of the Sherman Act whenever *both* conditions are met."

(Emphasis in original.)

Following this delineation of the hallmarks of illegality, however, the court made it clear that it is the resultant foreclosure of competition which offends the antitrust statutes. "The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market." *Id.* at 614, 73 S.Ct. at 883. The address of

---

10. Garvin v. American Motor Sales Corporation, 318 F.2d 518 (3 Cir. 1963); Woodard v. General Motors Corporation, 298 F.2d 121 (5 Cir. 1962).

11. Milos v. Ford Motor Company, 317 F.2d 712 (3 Cir. 1963); Staten Island Motors, Inc. v. American Motors Sales Corp., 169 F.Supp. 378 (D.N.J.1959).

12. Frank Chevrolet Co. v. General Motors Corp., 419 F.2d 1054 (6 Cir. 1969).

13. While the district judge found that McGeorge had not acted in bad faith, we note that business expediency in its relations with both Mercedes and Toyota influenced McGeorge to a large degree in its refusal to accept the dual dealership. Robert McGeorge testified that in the year 1969 his company sold 119 Mercedes, 246 Toyotas and 77 Triumphs. He further testified that his father, David McGeorge, had told him that he had spoken to Mercedes-Benz representatives about taking on Rover and that they "frowned" on it and that he felt "they would lift the franchise." The record further indicates that Toyota was pressing McGeorge to eliminate Triumphs and continue only with Toyota and Mercedes. This possibility played a significant part in Leyland's decision to seek another dealer who could guarantee more permanency.

14. 15 U.S.C. § 14.

15. 15 U.S.C. § 1.

the statutes to the anti-competitive effect of such an arrangement was emphasized by Mr. Justice Harlan in his dissenting opinion in Northern Pac. R. Co. v. United States, 356 U.S. 1, 14, 78 S.Ct. 514, 522, 2 L.Ed.2d 545 (1958):

"It is not, as the Court intimates at one point in its opinion, that under the Sherman Act the tying clause is illegal *per se*; the *per se* illegality results from its use by virtue of a vendor's dominance over the tying interest to foreclose competitors from a substantial market in the tied interest."

Similarly, the decisions in our circuit have focused upon the competitive effect of the suspect conduct. In McElhenney Co. v. Western Auto Supply Company, 269 F.2d 332, 338–339 (4 Cir. 1959), Judge Sobeloff stated that

"The gravamen of a Section 3 violation is the forbidden condition, agreement or understanding of exclusivity, and a proper pleading should assert this ultimate fact. It makes no difference whether this is voluntary or is imposed by coercion, but without such agreement, condition or understanding, there can be no statutory infraction. It is only in the presence of this essential element that consideration must be given as to whether competition may be substantially lessened or whether there is any tendency toward monopoly."

And in the later case of Advance Business Systems & Supply Co. v. SCM Corporation, 415 F.2d 55, 60 (4 Cir. 1969), Judge Sobeloff pointed out the manner in which competition is curbed by an illegal tie-in:

"First, the buyer is prevented from seeking alternative sources of supply for the tied product; second, compet-ing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement."

The language in these decisions accords with the rationale of two classic cases in this area, Fed. Trade Comm. v. Sinclair Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1923), and United Shoe Mach. Co. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922), that the vice of an illegal tie-in is the fact that the agreement or the effect thereof lessens competition in the tied product. We agree with the district judge that the dual dealership proposed by Leyland does not fall within that classification of arrangements which have no lawful business objective and "serve hardly any purpose beyond the suppression of competition."[16] The record supports the finding that Leyland's conduct did not impede nor tend to impede competition between Rover and other motor cars in its style and price range, and it is this fact which clearly distinguishes the case before us from the tie-ins which were condemned by the Court in Fortner Enterprises v. U. S. Steel, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pac. R. Co. v. United States, *supra;* and International Salt Co. v. United States, *supra.*

## IV

◼ In granting McGeorge relief under the Robinson-Patman Act the district court, acting pursuant to Section 4 of the Clayton Act,[17] entered orders awarding treble damages in the amount of $109,176 and attorney's fees in the amount of $25,700. Since we conclude that McGeorge was not entitled to relief under the antitrust laws, this award of treble damages as well as attorney's fees was, of course, improper.

16. Standard Oil Co. v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949).

17. 15 U.S.C. § 15.

In his initial computation of damages the district judge proceeded on the assumption that McGeorge should have received an additional 14 cars in the fall of 1969 and an additional 52 cars for the first seven months of 1970, or a total of 66 vehicles. Multiplying 66 by a gross profits factor of $708 per car, less certain adjustments, the court arrived at basic damages in the amount of $36,392. While the record supports the gross profits factor adopted by the district court, we agree with the defendant that the projected shortage of 52 cars in McGeorge's "allocation" for the first seven months of 1970 was erroneous.

In arriving at this projection the court accepted the formula propounded by the plaintiff's expert that 1967–68 sales of Triumphs to McGeorge amounted to 87 percent of the combined total of cars sold to three other designated dealers, and the application of this percentage to the units supplied to the same three dealers in 1970 gave McGeorge a projected allocation of 83 cars for that period. Since McGeorge, in fact, received only 31 cars during the period, the court concluded that it had been shorted 52 units. In our opinion the basic percentage should have been McGeorge's share of the aggregate of the vehicles supplied to McGeorge as well as the three other designated dealers in 1967–68. This would result in a projected allocation to McGeorge of 47 percent, and when this is applied to the 126 units available and delivered to the same four dealers during the first seven months of 1970, McGeorge would be entitled to 59 cars, with a resultant shortage of 28 instead of the 52 found by the district court. Accordingly, the judgment of the district court will be set aside and the case remanded for the assessment of damages only under the DDICA, and in assessing these damages the district court shall apply the formula to a projected shortage of 14 cars in the fall of 1969 and 28 cars in the first seven months of 1970.