Francis George **HINKLEMAN,**
**Plaintiff–Appellant,**

v.

**SHELL OIL COMPANY,**
**Defendant–Appellee.**

No. 91–2328.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 28, 1991.

Decided May 6, 1992.

As Amended July 21, 1992.

Harry Carl Storm, Abrams, West & Storm, P.C., Bethesda, Md., argued, for plaintiff-appellant.

M. Albert Figinski, Weinberg & Green, Baltimore, Md., argued (Carol Saffran-Brinks, Weinberg & Green, on the brief), for defendant-appellee.

Before RUSSELL and WILKINS, Circuit Judges, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

PER CURIAM:

Francis Hinkleman, a service station operator, appeals the district court's disposition under Federal Rules of Civil Procedure 12(b)(6) and 56 of his franchise claims against Shell Oil Company. Hinkleman had filed a two-count complaint with the district court alleging: 1) that Shell Oil Company's termination of his petroleum marketing franchise agreement violated section 102(b)(2)(C) of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2802(b)(2)(C) (1988); and 2) that Shell's discriminatory pricing practices through its lease of real estate to Hinkleman violated Maryland antitrust law, specifically Md. Com. Law Code Ann. § 11–204(a)(5) (1990).

The district court first dismissed Hinkleman's state antitrust claim under Rule 12(b)(6) for failure to state a claim, holding that the state statute prohibiting price discrimination did not apply to real estate leases. In a subsequent hearing, the district court granted Shell's motion for summary judgment on the franchise termination, ruling that Shell's termination of the franchise did not violate the PMPA. We affirm the district court's rulings.

## I.

Beginning in 1978, Francis Hinkleman leased and operated a service station in Pasadena, Maryland, with his son. Shell acquired the service station premises in November 1985 from Arco and offered Hinkleman a three-year franchise agreement to replace his existing agreement with Arco. The Shell franchise was renewed in November 1988 for five years.

Under all Shell franchise agreements, lessee dealers pay rent according to a Vari-

able Rent Program (VRP). The VRP grants reductions in a dealer's monthly lease payment if the dealer's gasoline purchases for that month exceed a stated threshold volume. Shell calculates the threshold volume of gasoline to be purchased monthly by each dealer based on (1) the business value of the location to the dealer and to Shell; (2) the occupancy costs incurred by Shell; and (3) the fair market value of Shell's investment in the property. The exact method for determining a dealer's threshold volume is not made known to the dealers; Shell merely informs them of the determined volume. If a dealer's gasoline purchases exceed the threshold, he qualifies for a rent abatement in the amount of 3.5 cents per gallon purchased over the threshold level. The average rent reduction for all Shell dealers was 31.99% in 1987, 51.64% in 1988, and 49.04% in 1989. In comparison, Hinkleman's rent reductions for those years were 0%, 0%, and 10%, respectively.[1]

In late 1988 or early 1989, a dispute arose concerning certain items appearing on Hinkleman's monthly trade statement from Shell. As a result, an outstanding balance of approximately $1,500 was carried from January through October 1989.[2] The matter was ultimately resolved in November 1989 after other problems with Hinkleman's account had developed.

In September 1989, Shell experienced the first in a series of problems collecting payments due under the franchise agreement. On September 20, a check for $9,448.14 tendered by Hinkleman to Shell as payment for a gasoline delivery was returned for insufficient funds. The bank admitted that the return of the check had been a bank error and issued a letter of apology to Hinkleman. Shell's territory manager nevertheless asked Hinkleman for a certified replacement check, refusing to accept a personal check offered by Hinkleman.

When payment was not received, on September 27 Shell sent Hinkleman a written notice giving him until October 9 to replace the returned check or to be placed on certified funds status (i.e. requiring all payments be made by certified check).

On October 2, Hinkleman again tendered a noncertified replacement check, which Shell refused to accept. Hinkleman thereafter made no further attempts to pay before the October 9 deadline. On October 13, Shell sent a written demand for payment of $11,213.64 by October 20. This sum included the amount of the dishonored check from September as well as the disputed trade balance carried since January 1989. The letter threatened franchise termination if Hinkleman did not keep his account current in the future.

A few days later Shell attempted to collect its October rent payment in normal course through electronic bank draft, but that attempt was rejected by the bank. Hinkleman, his lawyer and Shell's representatives then met and agreed that Hinkleman would provide a certified check to pay the September balance due and the October rent. Both amounts were paid on October 20. The disputed trade balance was ultimately resolved and paid on November 6.

On November 30, 1989, Shell sent Hinkleman a letter clearly warning that a termination notice would be issued if any further incident of indebtedness occurred. Approximately one month later, on December 25, another check tendered to Shell from Hinkleman did not clear the bank. Hinkleman notified Shell immediately upon learning of the check's dishonor and issued a replacement check on January 5, 1990.

In the ten-day interim before Shell received the replacement check, Shell sent Hinkleman a notice on January 4 stating its intent to terminate the lease and franchise

---

1. During those three years, Shell increased Hinkleman's threshold volume from 160,000 gallons per month to 170,000 gallons per month, despite his declining actual monthly sales during that period. Hinkleman attributes his decline in sales to the installation of a median strip in front of his station, thereby blocking access by

certain traffic, and to the opening of a state-of-the-art Exxon station in the immediate area.

2. Hinkleman did not dispute the whole $1,500 amount; however, he did not make any payment on this amount until the parties resolved the disputed charges.

agreement as of April 16, 1990. It cited Hinkleman's failure to make timely payments as the cause of termination. Shell had no set policy concerning the number of defaults it would tolerate before sending a notice of termination and determined each termination decision on the merits of the particular circumstances.

Two further incidents occurred after the date of the termination notice. On January 9, 1990, a check for $10,195.70 written for a gasoline delivery was returned for insufficient funds. Hinkleman subsequently replaced that check. The second incident took place on March 16, 1990, when Shell was unable to electronically draft the March rent because Hinkleman had closed his bank account. Hinkleman then tendered a check for the March rent within seven days.[3]

On March 23, 1990, Hinkleman filed suit in the U.S. District Court for the District of Maryland seeking injunctive relief from termination of the franchise. Shell consented to a temporary restraining order until a hearing could be held on the preliminary injunction. After a hearing on May 2, the court denied the injunction and Hinkleman vacated the leased premises.

Hinkleman, with leave of the court, then filed a two-count amended complaint seeking damages only. Count I alleged that Shell's termination was not in compliance with section 102(b)(2)(C) of the PMPA, 15 U.S.C. § 2802(b)(2)(C), which permits termination of a franchise agreement under specified circumstances. Hinkleman alleged that he had paid all outstanding balances to Shell, with only insignificant delays, and that Shell's termination was arbitrary, discriminatory and pretextual. Count II added a claim under the Maryland Antitrust Act, specifically Md.Com.Law Code Ann. § 11–204(a)(5), alleging that Shell engaged in unlawful price discrimination against Hinkleman through its administration of the VRP. Hinkleman contended that Shell, by setting his threshold levels of gasoline purchases at unreasonably high levels, charged him a monthly rental amount in excess of that charged other

Shell franchisees. He further contended that the leasing of the premises was a service provided by Shell directly connected with the sale of its gasoline to dealers. The Maryland Statute prohibits discrimination against a purchaser of a commodity bought for resale by furnishing any service connected with that commodity on unequitable terms to those purchasers.

Upon Shell's Rule 12(b)(6) motion, the district court dismissed Count II for failing to state a claim upon which relief could be granted. The court held that a real estate lease is not a "service" under the Maryland antitrust law, and, therefore, any allegations of discriminatory pricing practices through a real estate lease were not actionable under that statute. At a later date, the district court granted Shell's motion for summary judgment on Count I, finding that its termination of the franchise arrangement was in accordance with permissible terminations under the PMPA.

Hinkleman now appeals both judgments.

## II.

We have jurisdiction in this case under 28 U.S.C. § 1291 (1988). We consider separately the district court's disposition of each claim, beginning with the grant of summary judgment on Count I.

## A.

We review decisions granting summary judgment *de novo*, applying the same standards required of the district court. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir.1991); *see Higgins v. E.I. DuPont De Nemours & Co.*, 863 F.2d 1162, 1166–67 (4th Cir.1988). Summary judgment should be granted if the parties present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Miller v. Federal Deposit Ins. Corp.*, 906 F.2d 972, 973 (4th Cir.1990). In assessing the record evidence, we must view the facts in the light most favorable to the non-moving party. *Matsushita Elec.*

---

**3.** The parties dispute whether or not Shell had    prior notice of the closing of the bank account.

*Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The substantive law governing petroleum franchise agreements is the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841. Congress enacted Title I of the PMPA to protect "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 874. The PMPA prohibits termination or nonrenewal "unless ... based upon a ground specified or described in the legislation and ... executed in accordance with the notice requirements of the legislation." *Id.*

Section 2802(b)(2) enumerates the grounds for termination or nonrenewal of a franchise relationship. One ground specified in section 2802(b)(2)(C), is:

The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect. ...

Section 2802(c) follows with an illustrative list of events that qualify under section 2802(b)(2)(C) as "an event which is relevant to the franchise relationship." One on that list is "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled[.]" 15 U.S.C. 2802(c)(8). The stat-ute provides additional guidance by defining "failure" so as not to include:

(A) any failure which is only technical or unimportant to the franchise relationship; or

(B) any failure for a cause beyond the reasonable control of the franchisee.

15 U.S.C. § 2801(13).

Applying the statute to the facts of this case, we find that Shell clearly acted within the PMPA in terminating its franchise agreement. Hinkleman failed on multiple occasions to make timely payments under the franchise agreement.[4] His September payment was not made until October 20. While still delinquent in reissuing that check, Hinkleman's October rent payment did not clear the bank. After two written warnings, Hinkleman tendered yet a third bad check for payments under the franchise agreement on December 25. While the January 9 and March 16 incidents occurred after Shell had given notice of termination, they lend credence to Shell's justification for termination. The parties do not dispute that Shell gave proper notice of termination as required under the statute.

Furthermore, Hinkleman's failures are not exempt under section 2801(13) as "unimportant" failures. His failures constituted significant breaches of an important part of the franchise agreement. The number of delinquent payments as well as the length of delay in reissuing payment constituted more than just minor or technical violations of the franchise agreement. In addition, the amount of each delinquent

---

4. Hinkleman contends that we should consider only the December 25 check returned for insufficient funds. The Senate Report on the PMPA states that "[i]f the franchisor waives the exercise of termination or non-renewal rights based upon a specific occurrence of an event, the franchisor may not thereafter base termination or non-renewal upon the specific occurrence." S.Rep.No. 731, 95th Cong., 2d Sess. 34 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 892. Hinkleman asserts that Shell waived its termination rights as to delinquent payments prior to the December 25 check when it decided not to terminate after each earlier occurrence. In addition, Hinkleman argues that Shell's January 4 termination notice cited only the December 25 delinquency.

We are not persuaded by this argument for the following reasons. First, Shell more likely preserved rather than waived its termination rights through its October 13 and November 30 letters. The letters expressed Shell's dissatisfaction with Hinkleman's late payments and, because of such, threatened automatic termination upon any similar occurrence. Second, section 2802(b)(2)(C) permits termination for an event occurring "not more than 120 days prior to the date on which notification of termination ... is given...." Hinkleman's late payments, beginning with the September 20 returned check, occurred within 120 days prior to the January 4 notice of termination. We, therefore, consider all occurrences prior to January 4 in determining whether Shell had statutory justification for terminating the franchise agreement.

sum was significant. Each of the payments were for several thousand dollars and were delinquent in the entire amount due. This is not a case of constructive payment, where all but an insignificant amount had been rendered to the franchisor. These payments represented Shell's entire income for a particular month from Hinkleman's operations or lease of real estate.

Hinkleman urges us not to end our analysis at this point. He would have us extend our inquiry beyond the statutory requirements into the reasonableness and good faith of the franchisor. The Court, he argues, should consider all circumstances related to the franchise relationship, such as Shell's more favorable treatment of other franchisees, in order to discover possible pretextual motives. It should then determine, based on the totality of the evidence, whether or not termination was reasonable. In so urging, Hinkleman looks beyond the plain words of the statute to its Congressionally stated purpose of protecting franchisees and so implies an additional reasonableness requirement. We find this an attempt to add complexity to a relatively straightforward statute. We adopt Shell's position which relies on the plain language of the statute. It contends that the statute provides grounds that are *per se* reasonable for terminating a franchise, provided notification requirements are met, rendering further inquiry into pretext unnecessary.

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). The Supreme Court stated that "generalized references to the 'remedial purposes' of [an] ... Act will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.'" *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (quoting *Securities Exchange Comm'n v. Sloan,* 436 U.S. 103, 116, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978)). "Thus, if the language of a provision ... is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary 'to examine the additional considerations of "policy" ... that may have influenced the lawmakers in their formulation of the statute.'" *Aaron v. Securities Exchange Comm'n,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 214 n. 33, 96 S.Ct. 1375, 1391 n. 33, 47 L.Ed.2d 668 (1976)).

The language of sections 2802(b) & (c) is clear on its face. It unambiguously permits termination of a petroleum franchise agreement upon failure of the franchisee to timely adhere to payment obligations. A specific, limited reasonableness requirement is incorporated into the statute through section 2801(13), which defines "failure" so as to exclude "any failure which is only technical or unimportant to the franchise relationship," or "any failure for a cause beyond the reasonable control of the franchisee." Once a franchisor proves that section 2801(13) does not apply, however, its actions are presumed reasonable under the statute. The very language of the statute describes termination for late payments as reasonable. *See* 15 U.S.C. § 2802(c) ("'an event[,] ... a result of which termination of the franchise ... is reasonable,' includes .. failure by the franchisee to pay ... in a timely manner....."). Where, as here, the statute is sufficiently clear on its face, it is not necessary to turn to the legislative purpose to search for additional requirements.[5]

---

5. Although we need not look to the legislative purposes for clarification of this section, our interpretation fits squarely within the purposes intended by Congress. In enacting the PMPA, Congress intended to balance the "natural tensions which are created by this relationship[,]" i.e. balance "unfair terminations ... by franchisors for arbitrary and even discriminatory reasons" with "reasonable expectations of compliance by the franchisee with the provisions of the franchise agreement[.]" S.Rep. No. 731, 95th Cong., 2d Sess. 17–18 (1978), *reprinted in* 1978 U.S.C.C.A.N. 875–76. In addition, Congress expressed a need for a "uniform set of rules governing the grounds for termination ... of motor fuel marketing franchises.... Such a set of rules would clearly define the rights and obligations of the parties to the franchise rela-

Other circuit decisions support our conclusion.[6] In a similar case from the Eleventh Circuit involving failure to cure monetary defaults under a franchise agreement, the court stated:

> By its very terms, the PMPA provides that "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" is "an event which is relevant to the franchise relationship and *as a result of which termination of the franchise ... is reasonable...."* Section 102(c) of the PMPA, 15 U.S.C. § 2802(c), provides twelve situations in which Congress has decided that termination of a franchise agreement is reasonable.

*Clinkscales v. Chevron U.S.A., Inc.,* 831 F.2d 1565, 1573 (11th Cir.1987) (emphasis in original) (citations omitted); *see Desfosses v. Wallace Energy, Inc.,* 836 F.2d 22, 26 (1st Cir.1987) ("If an event falls within the [section 2802(c) ] list, termination is conclusively presumed to be reasonable as a matter of law."); *Russo v. Texaco,* 808 F.2d 221, 223, 225 (2d Cir.1986) ("Once having ascertained that an event is encompassed by one of the twelve enumerated events [in section 2802(c) ], a court need make no further inquiry as to the reasonableness of the termination.").

Finding no genuine issue of material fact, and finding Shell's position the favorable under the law, we affirm the District Court's grant of summary judgment.

### B.

In Count II of his complaint, Hinkleman asserts that Shell's VRP violated section 11–204(a)(5) of the antitrust subtitle of the Maryland Commercial Law. The district court dismissed Hinkleman's antitrust claim because it failed to state a cause of action under the statute. The court ruled that the statute's prohibition of price discrimination through services connected to the sale of a commodity did not apply to real estate leases. Rather, "services" included only marketing or advertising services for a particular commodity. Because this issue comes to us from a dismissal by the district court, we review only the narrow issue of whether a real estate lease can be a "service" connected to the sale of a commodity under the Maryland antitrust statute. We affirm the district court's ruling that it can not.

■ We review the district court's dismissal of a claim under Fed.R.Civ.Proc. 12(b)(6) *de novo.* "For purposes of review of a Rule 12(b)(6) dismissal, the factual allegations of [a] complaint are taken as true." *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990). The judgment to dismiss should be affirmed only if the plaintiff fails to prove any set of facts in support of a claim for which relief can be granted. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

■ Section 11–204(a)(5) of the Maryland commercial statutes provides that a person may not:

> [d]iscriminate in favor of one purchaser against another purchaser of a commodity bought for resale, with or without processing, by contracting to furnish, furnishing, or contributing to the furnishing of any service or facility connected with the processing, handling, sale, or offering for sale of the commodity on terms not accorded to all purchasers on proportionally equal terms.

This provision is substantially identical to section 2(e) of the Robinson–Patman Act, codified at 15 U.S.C. § 13(e) (1988).[7]

---

tionship in the crucial area of termination of a franchise...." *Id.* at 19, *reprinted in* 1978 U.S.C.C.A.N. at 877.

**6.** We recognize that there is a division among the circuits on this issue. The Sixth and Third Circuits have taken a position contrary to other circuits. *See Marathon Petroleum Co. v. Pendleton,* 889 F.2d 1509, 1512 (6th Cir.1989) ("we must scrutinize the reasonableness of termi-

nations even when an event enumerated in § 2802(c) has occurred"); *Sun Refining and Marketing Co. v. Rago,* 741 F.2d 670, 673 (3d Cir.1984) ("we decline to construe § 2802(c) as a per se termination rule favoring franchisors").

**7.** Section 2(e) provides:

> It shall be unlawful for any person to discriminate in favor of one purchaser against another

■ The antitrust subtitle of the Maryland Commercial Law was enacted to "complement the body of federal [antitrust] law...." Md.Com.Law Code Ann. § 11–202(a)(1). The statute provides that federal court interpretations of similar federal laws should guide the interpretation of the Maryland antitrust laws. § 11–202(a)(2). Similarly, the federal district court has stated that state claims under section 11–204(a) and (b) must fail where those same claims would also fail under similar federal law. *Purity Prods., Inc. v. Tropicana Prods., Inc.*, 702 F.Supp. 564, 574 (D.Md. 1988), *aff'd*, 887 F.2d 1081 (4th Cir.1989); *Neugebauer v. A.S. Abell Co.*, 474 F.Supp. 1053, 1071 (D.Md.1979). Since there are no state court decisions on this issue, and since the provisions of section 11–204(a)(5) are almost identical to those of section 2(e) of the Robinson–Patman Act,[8] we look to cases construing section 2(e) in considering Hinkleman's claim.

The Robinson–Patman Act gives no definition of prohibited "services or facilities" except that they be such as are "connected with the processing, handling, sale, or offering for sale" of a commodity purchased for resale. 15 U.S.C. § 13(e). In construing the statutory language, several federal courts have defined services within the purview of section 2(e) as "advertising," "promotional" or "merchandising" services.

*Purdy Mobile Homes, Inc. v. Champion Home Builders Co.*, 594 F.2d 1313, 1317 (9th Cir.1979); *Kirby v. P.R. Mallory & Co., Inc.*, 489 F.2d 904, 910–11 (7th Cir. 1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974); *Skinner v. United States Steel Corp.*, 233 F.2d 762, 766 (5th Cir.1956); *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 851 (M.D.Tenn.1974). Similarly, the Federal Trade Commission, in their guidelines to businesses seeking to act within the statute, stated that although "services" and "facilities" have not been defined by statute, one requirement is that they be used primarily to promote the resale of a commodity. 16 C.F.R. § 240.7.[9] For reasons fully stated below, we likewise adopt this interpretation and limit discriminatory "services or facilities" proscribed under section 2(e) of the Robinson–Patman Act to advertising, promotional or merchandising services.[10]

This construction supports the intent of the Robinson–Patman Act. In enacting the Act, Congress sought to maximize consumer welfare by preventing "distortion of competition among favored and disfavored buyers." Phillip E. Areeda, *Antitrust Law* 135 (1991). The purpose of section 2(e) in particular was to prevent this distortion from occurring through the disguise of advertising services, a scheme frequently em-

purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

8. The only significant difference between the two statutes is that the Maryland statute provides a definition of "service." Section 11–201(g) of the subtitle defines "service" as

any activity performed in whole or in part for the purpose of financial gain, and includes any sale, rental, leasing, or licensing for use. Although, as Hinkleman points out, this definition includes leasing, it does not specify real estate leasing. Therefore, we must still look to the governing provisions of § 11–204(a)(5) and its federal counterpart to determine if real estate leasing is a "service" under the statute.

9. Section 240.7 gives a nonexclusive list of examples of services and facilities covered by sections 2(d) and (e):
   Cooperative advertising;
   Handbills;
   Demonstrators and demonstrations;
   Catalogues;
   Cabinets;
   Displays;
   Prizes or merchandise for conducting promotional contests;
   Special packaging, or package sizes.
   The enumerated items are clearly advertising, promotional or merchandising in nature.

10. Commentators have similarly posited that § 2(e) does not apply to services outside the scope of merchandising or advertising services. *See, e.g.,* Fredrick M. Rowe, *Price Discrimination Under the Robinson–Patman Act* 371–72 (1962); Note, *The Distinction Between the Scope of Section 2(a) and Sections 2(d) and 2(e) of the Robinson–Patman Act*, 83 Mich.L.Rev. 1584, 1597–98 (1985).

ployed to evade the prohibitions of the Clayton Act prior to enactment of Robinson–Patman. Note, *The Distinction Between the Scope of Section 2(a) and Sections 2(d) and 2(e) of the Robinson–Patman Act,* 83 Mich.L.Rev. 1584, 1593 & n. 55 (1985).

The specific question of whether section 2(e) applies to real estate leases is one of first impression for us. Only one court has ruled on this issue. In a summary fashion, the court in *Rea v. Ford Motor Co.,* 355 F.Supp. 842, 869 (W.D.Pa.1973), *rev'd in part on other grounds,* 497 F.2d 577 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974), held that "leasing and conveyances of real estate are not a violation of [section 2(e) of] Robinson–Patman as charged by plaintiffs." In *Rea,* the court was deciding if favorable terms of leasing and real estate sales to certain car dealers by Ford was actionable under section 2(e) by a disfavored dealer. Despite favorable leasing terms given to certain dealers, the court found "no evidence of price discrimination [in the sale of automobiles] between dealers" and, thus, no violation of the Robinson–Patman Act. *Id.*

Furthermore, courts have not been willing to apply section 2(e) to every case in which a supplier of a product discriminates among customers. In an analogous prior case, this Court refused to apply section 2(e) to services not directly promoting goods bought for resale. *See David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 55 (4th Cir.1974) (holding that reduction in supply of cars available to purchaser retailer was "beyond the pale of Robinson–Patman"), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *see also Skinner v. United States Steel Corp.,* 233 F.2d 762, 765 (5th Cir.1956) (favorable credit terms to

certain purchasers beyond scope of section 2(e)).

We are convinced that real estate leases like the one at issue here are not within the scope of Robinson–Patman Act section 2(e) and, therefore, also not within section 11–204(a)(5) of the Maryland antitrust statute. The leased premises here, like the quantity of cars supplied in *McGeorge Car Co.* or the credit terms in *Skinner,* do not actively promote the resale of gasoline by Hinkleman to the retail consumer. Rather, the premises merely facilitate Hinkleman's resale of gasoline. As we have already stated, Robinson–Patman section 2(e) only prohibits discrimination through services, like advertising or merchandising, that promote the resale of a commodity. While *McGeorge Car Co.* and *Skinner* can be factually distinguished from our case in that the services offered there primarily concern the original sale to the retailer, we would not adopt such a distinction as a means of demarcating services prohibited under section 2(e) from those outside its scope. Instead, as we have stated, we would exclude real estate leases from the prohibitions of section 2(e) because they do not serve to promote a commodity to the ultimate retail consumer.

We adopt this narrow view of section 2(e) proscriptions in order to promote more effectively the goals of the Robinson–Patman Act. As previously stated, Congress sought through the Robinson–Patman Act to maximize consumer welfare by enacting statutes intended to prohibit anticompetitive behavior. Thus, section 2(a) of the Act, which prohibits both direct and indirect price discrimination, requires a showing of competitive injury to prove a violation of the Act.[11] A seller can successfully rebut a prima facie case of section 2(a) price discrimination by showing cost differentials in the goods sold or related services

---

11. Section 2(a), 15 U.S.C. § 13(a), provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person ...: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered....

provided. This required showing of competitive injury absent cost justification demonstrates Congress' understanding that not all direct or indirect price differentials are anticompetitive. For example, quantity discounts justified by a lower manufacturing or handling cost would be protected under section 2(a). In contrast, section 2(e) requires no showing of competitive injury. Behavior found to violate section 2(e) "is illegal per se, irrespective of competitive impact and without resort to statutory justification." *Kirby*, 489 F.2d at 910. Because application of a *per se* rule risks adverse consequences, we prefer to limit the scope of section 2(e) to that necessary to fulfill the section's purposes. Other, nonpromotional forms of direct or indirect discrimination should be judged under the more flexible standards of section 2(a) so that courts can protect procompetitive behavior from prosecution.[12]

In holding that section 11–204(a)(5) does not apply to real estate leases, we affirm the district court's dismissal of Count II of Hinkleman's claim.

### CONCLUSION

First, we find that Shell acted within the provisions of the PMPA when it terminated a dealer franchisee for repeatedly failing to make timely payments under the franchise agreement. Accordingly, we affirm the district court's grant of summary judgment on this issue. Second, we hold that section 11–204(a)(5) of the Maryland Commercial law, which prohibits furnishing services on a discriminatory basis to purchasers of goods for resale, does not apply to Shell's VRP, as a real estate lease is not a "service" promoting the resale of a commodity. We, therefore, affirm the district court's dismissal of this issue under Fed.R.Civ.P. 12(b)(6).

AFFIRMED.

WILKINS, Circuit Judge, concurring in part and dissenting in part:

I agree that the district court properly granted summary judgment in favor of

Shell Oil Company on Hinkleman's cause of action under the Petroleum Marketing Practices Act, 15 U.S.C.A. §§ 2801–41 (West 1982). I disagree, however, that a service station cannot, as a matter of law, constitute a "service or facility" within the meaning of Md.Com.Law Code Ann. § 11–204(a)(5) (1990).

As explained in the majority opinion, Hinkleman alleges a violation of Maryland law, not § 2(e) of the Robinson–Patman Antidiscrimination Act, 15 U.S.C.A. § 13(e) (West 1973); however, interpretation of § 2(e) given by federal courts guides interpretation of the Maryland statute. Md.Com. Law Code Ann. § 11–202(a)(2) (1990). In reaching its conclusion, the majority confines the type of benefits encompassed within the phrase "services or facilities" to only those benefits that "promote" the resale of the commodity and adopts an unduly restrictive interpretation of the term "promotes." Because its conclusion is unsupported by the plain language of the state or federal statutes in question, prior federal court decisions interpreting § 2(e), or the underlying purpose of that statute, I would reverse the Federal Rule of Civil Procedure 12(b)(6) dismissal of Hinkleman's cause of action under section 11–204(a)(5) and remand for further proceedings.

"Statutory construction begins with an examination of the literal language of a statute," and "in the absence of 'a clearly expressed legislative intent to the contrary,'" unambiguous statutory language must be given its plain meaning. *United States v. Blackwell*, 946 F.2d 1049, 1052 (4th Cir.1991) (quoting *Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983)). The plain language of sections 11–204(a)(5) and 2(e) prohibits the provider of a commodity intended for resale from discriminating among its customers by furnishing any "service or facility" connected with the offering for sale of the purchased commodity that is not fur-

---

12. Since Hinkleman did not bring charges of price discrimination under Md.Com.Law Code Ann. § 11–204(a)(3), which is similar to section 2(a), we do not examine his claim under that statute.

nished to its other customers on substantially· equal terms. Thus, the sole issue before the court[1] is whether Shell's furnishing a service station to one of its customers from which gasoline is marketed for resale to the public amounts to furnishing a "service or facility."

The plain language of the Maryland Antitrust Act dictates that the lease of the service station is a service within the meaning of that Act. Section 11–201(g) of the Maryland Act defines the term "service" to include "any sale, rental, leasing, or licensing for use." Md.Com.Law Code Ann. § 11–201(g) (1990). The word "any" modifies each of the words following it, unambiguously stating that *any* "leasing" is a service within the meaning of the Act. The Robinson–Patman Act contains no such definition. Thus, while interpretations of § 2(e) should be used to guide those of section 11–204(a)(5), because the Maryland Act contains a provision not included in the Robinson–Patman Act that specifically defines this critical term, the plain language of that definition must control. This definition compels the conclusion that the lease of a service station is a "service" under section 11–204(a)(5).

Neither the state nor federal statutory schemes clarifies the meaning of the term "facility." A service station, however, qualifies as a "facility" in common parlance. A "facility" generally is defined as "something ... that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end" and "something that promotes the ease of any action, operation, transaction, or course of conduct." *Webster's Third New International Dictionary* 812–13 (1981). Consequently, I believe that a service station is a "facility" within the plain language of the statutes.

Federal courts consistently have interpreted the phrase "services or facilities" in § 2(e) to apply "to various benefits which facilitate the resale of a product by the favored customer." 3 Earl W. Kintner & Joseph P. Bauer, *Federal Antitrust Law*, § 27.6, at 544 (1983) (noting that § 2(e) prohibits the furnishing of "benefit[s] which will make it easier for the favored customer to *resell* the product") [hereinafter Kintner]. Section 2(e) prohibits a supplier from furnishing on substantially unequal terms benefits connected to the resale of a commodity purchased for resale, as opposed to benefits relating to the original sale. *See, e.g., Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 546 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984); *see also* 16 C.F.R. § 240.7 (1991); Kintner § 27.6. Compare those benefits constituting a violation of § 2(e), *Federal Trade Comm'n v. Simplicity Pattern Co.*, 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959) (catalogues, storage cabinets, and transportation costs); *P. Lorillard Co. v. FTC*, 267 F.2d 439 (3d Cir.) (advertising), *cert. denied*, 361 U.S. 923, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959), and *Elizabeth Arden Sales Corp. v. Gus Blass Co.*, 150 F.2d 988 (8th Cir.) (salesrelated personnel), *cert. denied*, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945), with those not violating § 2(e), *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.*, 594 F.2d 1313 (9th Cir.1979) (refusal to sell certain line of products to customer), and *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.*, 504 F.2d 52 (4th Cir.1974) (quantity of product to be supplied to customer), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975). A review of the judicial decisions, scholarly writings, and regulatory clarification addressing the types of benefits encompassed in the phrase "services or facilities" in § 2(e) clearly demonstrates that those benefits which relate to and facilitate the resale of the product are included and those benefits which relate to or facilitate the original sale between the supplier and customer are excluded.

---

**1.** The terms of the variable rent program and how those terms translate into furnishing a service station on unequal terms to Hinkleman are detailed in the majority opinion. The posture of the case before this court requires that we assume that the service station was furnished by Shell on substantially unequal terms. Thus, we need only decide whether furnishing· a service station through a lease amounts to furnishing a "service or facility."

The majority concedes that a service station facilitates the resale of gasoline, rather than the original sale. The majority, however, holds that in order to be a "service or facility" within the meaning of § 2(e) a benefit must·"promote" resale of the product and narrowly interprets what benefits in fact "promote" resale, ignoring that under prior interpretations of § 2(e) Hinkleman's allegations would be sufficient to state a cause of action. This restricted interpretation of § 2(e) contravenes not only the plain meaning of the statute but also its purpose—to prohibit price discrimination in disguised forms. See discussion of legislative history at *P. Lorillard Co.*, 267 F.2d at 443 (advertising and promotional services were regarded as the principal form of price discrimination to which the Robinson–Patman Act was directed but the Act was intentionally drafted more broadly to encompass other practices that might accomplish price discrimination) and Frederick M. Rowe, *Price Discrimination Under the Robinson–Patman Act*, § 13.2, at 370 (1962); see also discussion of historical background of the Robinson–Patman Act at *Simplicity Pattern Co.*, 360 U.S. at 68–69, 79 S.Ct. at 1013–14.

In *Simplicity Pattern Co.*, a manufacturer of dress patterns discriminated in favor of department and variety stores and against smaller stores by furnishing, among other things, steel storage cabinets free of charge to the larger stores. 360 U.S. at 59–60, 79 S.Ct. at 1008–09. The Supreme Court affirmed the finding of the Federal Trade Commission that· Simplicity had violated § 2(e) by furnishing the larger stores "services and facilities not accorded to competing smaller customers on proportionally equal terms." *Id.* at 56–59, 79 S.Ct. at 1008–09. Under the reasoning of the majority, if Simplicity had chosen to furnish on unequal terms the entire store, instead of merely storage cabinets, it would have committed no violation of § 2(e).

Similarly, under the rationale of the majority, if Shell furnishes on unequal terms

signs to be affixed to the front of its gasoline purchasers' service stations, § 2(e) is violated. But, if it furnishes the entire service station on unequal terms, § 2(e) ·is not violated.[2] The violation is more egregious, rather than non-existent, in the latter instances.

The majority justifies its restrictive interpretation of § 2(e) on the basis that economic policy is better served by limiting those benefits cognizable under § 2(e). The Supreme Court has emphasized, however, that courts are "not in a position to review the economic wisdom of Congress." *Simplicity Pattern Co.*, 360 U.S. at 67, 79 S.Ct. at 1012. Thus, a court should not implement its notions of proper economic policy by ignoring that Congress has plainly chosen under § 2(e) to make furnishing on a substantially unequal basis "services or facilities" connected with the sale of commodities purchased for resale a per se violation of law.

Further, the Supreme Court has previously rejected essentially the same economic argument as that advanced by the majority. Refusing to read a cost justification defense or competitive injury requirement into § 2(e), it stated:

> [W]e cannot say that the legislative decision to treat price and other discriminations differently is without a·rational basis. In allowing a "cost justification" for price discriminations and not for others, Congress could very well have felt that sellers would be forced to confine their discriminatory practices to price differentials, where they could be more readily detected and where it would be much easier to make accurate comparisons with any alleged cost savings.

*Id.* at 67–68, 79 S.Ct. at 1012–13. As recognized by the Supreme Court, we must defer to Congress's decision concerning the merit of requiring competitive injury and should not legislate by attempting to restrict the scope of § 2(e) in order to force litigation of alleged violations to § 2(a) of the Act because the majority believes that this section advances sounder economic policy.

**2.** One is left to wonder how the majority would resolve the issue if the service station that was furnished on unequal terms had the Shell logo painted on the front of the building.

384

Moreover, the conclusion of the majority that a service station does not promote the resale of gasoline is dubious. Aside from the district court opinion in *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1973), *rev'd in part on other grounds*, 497 F.2d 577 (3d Cir.), and *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974), which the majority concedes fails to provide any reasoning to justify its decision, the majority offers no authority for this conclusion. In my view, a service station does "promote" the resale of gasoline. To "promote" means "to contribute to the growth, enlargement, or prosperity of"; to further; to encourage; and "to present ... for public acceptance through advertising and publicity." *Webster's Third New International Dictionary* 1815 (1981). In the sense that a service station makes possible the resale of gasoline and presents gasoline to the public for resale, it promotes those sales. Thus, assuming the restrictive interpretation of "services or facilities" adopted by the majority is correct, it has been misapplied.

Assuming for purposes of Rule 12(b)(6) that Shell furnished service stations on unequal terms in connection with the sale of its gasoline through its variable rent program, that activity is prohibited by the plain language of the Maryland Antitrust Act. Additionally, a conclusion that Hinkleman's allegations state a cause of action is consonant with prior interpretations finding that § 2(e) prohibits the furnishing on an unequal basis benefits that facilitate the resale of the product and furthers legislative intent to prohibit disguised price discriminations. I would find that Hinkleman's allegations that Shell arbitrarily and discriminatorily established the thresholds above which its franchisees received a rent rebate on gasoline sales under its variable rent program, effectively supplying on unequal terms the service stations from which its franchisees resold gasoline purchased from Shell to the public, states a claim for relief under Md.Com.Law Code Ann. § 11–204(a)(5).