CHEVRON U.S.A. INC., Plaintiff–
Counterdefendant–Appellee,

v.

Samir L. EL–KHOURY, Defendant–
Counterclaimant–Appellant.

No. 00–57126.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 2002.

Filed April 9, 2002.

As Amended on Denial of Rehearing
May 14, 2002.

Kenneth P. Roberts and John J. Stifter, Kenneth P. Roberts, APLC, Woodland Hills, CA, for the defendant-appellant.

Robert C. Phelps, Skjerven Morrill MacPherson LLP, San Francisco, CA, for plaintiff-appellee.

Before FERGUSON, TASHIMA, and GRABER, Circuit Judges.

## OPINION

GRABER, Circuit Judge.

Defendant Samir L. El–Khoury owns and operates one of Plaintiff Chevron U.S.A. Inc.'s service station franchises in California. After its efforts to buy El–Khoury's franchise failed, Chevron conducted an audit and discovered that El–Khoury had underpaid state sales tax. Chevron served notice to El Khoury that it intended to terminate his franchise and that the failure to pay state sales tax was a permissible ground for termination under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–2841. El–Khoury objected to the termination. This action for declaratory relief followed.

The district court granted summary judgment to Chevron, declaring that termination of the franchise was permissible under the PMPA. On appeal, we hold that summary judgment was not appropriate because there is a question of fact as to whether El–Khoury's failure to pay state sales tax was sufficiently material to the franchise relationship to allow for its ter-

mination.[1] Accordingly, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

### A. The Franchise Agreement

In 1984, El–Khoury obtained a franchise service station and convenience store from Chevron. Chevron and El–Khoury had a typical gasoline franchise arrangement. Chevron retained ownership of the facility but leased the station to El Khoury. Chevron licensed its trademarks to El–Khoury and supplied the gasoline sold at the franchise. In return, El–Khoury paid a portion of his sales to Chevron as rent. The agreement between Chevron and El–Khoury consisted of a Dealer Lease, Dealer Supply Contract, and other attached riders and exhibits (collectively, the Dealer Agreements). The Dealer Agreements were renewed regularly. The current Dealer Agreements were executed in March of 1997.

In 1996, during negotiations with its many franchisees to renew the Dealer Agreements, Chevron sought to include a specific reference to its right to audit tax returns and schedules.[2] Dealers objected to this provision. In response to those objections, Chevron eliminated the reference to tax records. Instead, the final Dealer Agreements provide more generally that Chevron has the right to audit "all books and records relevant to Dealer's operation of the premises." The Dealer Agreements also include a general provision in which the dealer agrees to "comply with all applicable Federal, state and local

---

1. El–Khoury also argues that the evidence permits an inference that Chevron's stated reason for terminating the franchise was pretextual. Because we hold that summary judgment was inappropriate on an alternative ground, we need not and do not reach this issue.

2. The proposal would have required the Dealer to provide Chevron with "copies of Dealer's

state and federal income tax returns and schedules pertaining to Dealer's operations at the premises," along with authorization to obtain that information directly from the taxing agencies. State sales taxes generally are deductible from federal income taxes, 26 U.S.C. § 164; 26 C.F.R. § 1.164–1(a)(4) and (5). That being so, Chevron's broad proposal encompassed state sales taxes indirectly.

laws and regulations relevant to the use and operation of the premises."

## B. *The Attempts to Purchase the Franchise*

In 1996, Chevron began implementing a business plan that sought to eliminate so-called "three-party control" over certain franchises. Chevron targeted franchises that were considered "long-term strategic locations" based on their facilities, sales volume, and other factors. El–Khoury's franchise was such a location. That same year, Chevron approached El–Khoury and proposed that the franchise become a "co-branded location," meaning that part of the franchise would become a McDonald's restaurant. El–Khoury ultimately rejected that proposal.

Chevron continued to pursue the co-branded location idea. In 1997, Chevron discussed the matter with El–Khoury at a general dealer meeting. El–Khoury remained concerned that the franchise would lose business to McDonald's. In late 1997 or early 1998, Chevron changed its approach and instead offered to *purchase* the franchise for $400,000. El–Khoury considered the franchise to be worth much more and, therefore, declined Chevron's offer. On December 29, 1997, Chevron sent a letter to McDonald's stating that it had "attempted unsuccessfully to buyout the station from the dealer at this site, and as a result is ceasing any further negotiations."

However, Chevron continued its efforts to purchase El–Khoury's franchise even after it had decided not to pursue the co-branded facility idea. In late 1998 or early 1999, Chevron's retail marketing manager, Mike Riley, and another employee, Noushad Hyder, tried to persuade El–Khoury to accept the $400,000 offer. Chevron approached El–Khoury's daughter about the sale as late as June of 1999.

## C. *The Audit and the Termination*

In the second quarter of 1999, Riley nominated El–Khoury as a candidate for audit. An independent firm conducted the audit on April 22, 1999. The auditors discovered that the franchise had underreported and underpaid California state sales tax by approximately $15,000. In May of 1999, Chevron issued a Notice of Termination, informing El–Khoury of its intent to terminate the franchise. Chevron stated that El–Khoury had violated the general provision of the Dealer Agreements regarding a dealer's compliance with law.[3] To support its termination notice, Chevron attached the independent audit report.

At first, El–Khoury denied that he had knowingly underreported sales tax. Later, he admitted that he had underreported and underpaid because of financial difficulties. El–Khoury stated that he always had intended to file amended returns to correct the violation. In March of 2000, he did so. He has paid the deficiency, including interest and penalties, and is now in good standing with the state.

## D. *The District Court Proceedings*

In August of 1999, Chevron filed this action seeking a declaratory judgment that its termination of El–Khoury's franchise was proper. El–Khoury counterclaimed, alleging wrongful termination and seeking a declaratory judgment that the termination was improper.

Both parties moved for summary judgment. Chevron contended that it could terminate the franchise because of El–Khoury's underpayment of California sales tax. El–Khoury argued that his underpayment of sales tax was not material to the franchise relationship.

The district court decided that Chevron properly terminated the franchise under two provisions of the PMPA: 15 U.S.C. § 2802(b)(2)(A) and (b)(2)(C). The court determined that El–Khoury's breach of the Dealer Agreements was material to the

---

**3.** In its notice, Chevron also cited a failure to maintain adequate records. However, in this action, Chevron has not advanced that deficiency as a ground for termination.

franchise relationship as a matter of law under subsection (b)(2)(A). Even if there was some question as to the materiality of the violation, the court held, the materiality of El–Khoury's violation was irrelevant under the second provision, subsection (b)(2)(C). For those reasons, the district court granted summary judgment for Chevron. El–Khoury timely appealed.

## DISCUSSION

We review de novo a grant of summary judgment. *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 762 (9th Cir.1999). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the law requires a holding in the moving party's favor. *Id.*

El–Khoury does not dispute that he knowingly underreported the franchise's state sales tax and that his doing so breached the Dealer Agreements. However, the parties do dispute whether that breach was material to the franchise relationship. We hold that both of the cited provisions governing termination of a gasoline franchise agreement require an inquiry into the significance of the breach. Because El–Khoury has raised a genuine issue of material fact as to whether his failure to pay sales tax was material to the franchise relationship, we reverse and remand.

### A. *The Statutory Framework*

We turn first to the applicable statutory provisions. The parties' relationship is governed by the PMPA. The PMPA gener-

ally prohibits early termination of a franchise agreement "[e]xcept as provided in subsection (b)" of 15 U.S.C. § 2802. 15 U.S.C. § 2802(a)(1). Chevron cites two provisions of subsection (b) in support of its termination of the franchise: 15 U.S.C. § 2802(b)(2)(A) and (b)(2)(C).[4]

Subsection (b)(2)(A) states that a franchisor may terminate upon "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship."

Subsection (b)(2)(C) states that termination is permissible on "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise ... is reasonable." Section 2802(c) provides a nonexhaustive list of "relevant" events that would be "reasonable" grounds for termination under subsection (b)(2)(C). 15 U.S.C. § 2802(c). One item on that list, § 2802(c)(11), is the "knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the marketing premises."

The PMPA defines "failure." Section 2801(13)(A) states that "[t]he term 'failure' *does not include ... any failure which is* only technical or *unimportant to the franchise relationship.*" (Emphasis added.)

### B. *Materiality of El–Khoury's Violation Under the Applicable Provisions*

█ The district court held that only subsection (b)(2)(A) requires Chevron to prove that the ground for termination is of

---

4. In its petition for rehearing, Chevron asserts that we overlooked the potential relevance of 15 U.S.C. § 2802(c)(1), which provides that "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises" is a reasonable ground for termination. *See, e.g., Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 361 (2d Cir.1989) (noting as an example a dealer's misappropriation and misuse of a customer's credit card). However, Chevron neither relied on that provision before the district court nor argued for its application in the opening brief on appeal. Consequently, this issue was waived, and we do not consider it further.

"material significance." Under the district court's analysis, the importance of the breach to the franchise relationship is not relevant under subsection (b)(2)(C). El-Khoury did not dispute that he had knowingly failed to comply with state-tax laws pertaining to the franchise. Because an event specifically enumerated in § 2802(c)(11) had occurred, the district court concluded that termination was permissible under subsection (b)(2)(C) as a matter of law.

In so holding, the court erred. Subsection (b)(2)(A) uses the word "failure," and (b)(2)(C) incorporates it by reference. The statutory definition of "failure" necessarily requires an inquiry into the significance of the violation. That definition excludes any failure that is "only technical or unimportant to the franchise relationship." 15 U.S.C. § 2801(13)(A). The event listed in § 2802(c)(11) refers to a "failure" to comply with state law. The term "failure" as it is used there must have the statutory meaning set out in § 2801(13). We so hold because the definitions found in 15 U.S.C. § 2801 apply to the listed terms "[a]s used in this subchapter," without exception. Section 2802 appears in the same subchapter as § 2801, and nothing in § 2802 excludes any use of the term "failure" from the general definition found in 15 U.S.C. § 2801(13) either expressly or by necessary implication. *See Sun Ref. & Mktg. Co. v. Rago,* 741 F.2d 670, 673 (3d Cir. 1984) (holding that the "failures" listed in § 2802(c) must be construed in harmony with the definition of "failure" in § 2801(13)).

By excluding technical or unimportant breaches from the definition of "failure," Congress expressed its intent that "technical or minor violations of the contract" should not allow a franchisor to terminate a franchise. S.Rep. No. 95–731, at 18 (1978). Considering termination an "extreme remedy," Congress intended to restrict that remedy to contractual violations that are "so serious as to undermine the entire relationship." *Id.*

The materiality of El-Khoury's violation is thus relevant to both of the pertinent subsections allowing for termination of a franchise. With respect to subsection (b)(2)(A), El-Khoury's failure to pay state sales tax did violate the provision of the Dealer Agreements that requires compliance with federal, state, and local laws. However, in order for termination to be proper on that ground, the text of subsection (b)(2)(A) requires that the violated provision be "both reasonable and of material significance to the franchise relationship." In addition, subsection (b)(2)(A) requires that the franchisee's violation be a "failure" to comply with some provision of the franchise; the definition of "failure" in turn excludes a violation that was technical or unimportant to the franchise relationship.

Subsection (b)(2)(C) requires a similar inquiry where, as here, the relevant event is an alleged "failure" to comply with law under § 2802(c)(11). Consistent with the statutory definition, the term "failure" excludes violations that are only technical or that are unimportant to the franchise relationship. 15 U.S.C. § 2801(13)(A). El-Khoury does not argue, nor do we conclude, that a failure to pay state sales tax arising from the operation of the franchise is "only technical." But, if El-Khoury's failure to pay state sales tax was "unimportant to the franchise relationship," it still could not constitute a "failure" within the meaning of § 2802(c)(11).

We emphasize that not every ground for termination under the PMPA requires an inquiry into materiality. Rather, we examine the text of the provision at issue to see whether Congress has required a showing of materiality to permit the termination of a franchise.

Our holding today is consistent with *Atlantic Richfield Co. v. Guerami,* 820 F.2d 280 (9th Cir.1987). There, we held that it was not necessary to determine whether a

violation was serious enough to warrant termination under subsection (b)(2)(C) *if an event listed under § 2802(c) had occurred. Id.* at 283. In *Guerami,* the franchise was terminated because the franchisee had been "convict[ed] . . . of [a] felony involving moral turpitude." 15 U.S.C. § 2802(c)(12). Section 2802(c)(12) does not use the term "failure." In *Guerami,* there was no question that an "event" enumerated in § 2802(c) had occurred. 820 F.2d at 283.

Here, that is precisely the question: If El–Khoury's failure to pay state taxes was a "failure" as defined by the PMPA, then an enumerated "event" occurred and termination is proper under § 2802(c)(11). By contrast, if the sales-tax violation was unimportant to the franchise relationship, no "failure" and thus no "event" occurred, and termination is not permissible.

## C. *In This Case, the Materiality of the Violation is a Question of Fact*

■ Whether a violation is a "failure" that is serious enough to warrant termination can be a question of fact for trial. In *Khorenian v. Union Oil Co.,* 761 F.2d 533, 536(9th Cir.1985), we construed the materiality requirement in (b)(2)(A) and noted:

> In making determinations in franchise termination cases under the PMPA, we look not only at the nature of the provision allegedly violated, but also at the nature and effect of the alleged breach. Whether a breach . . . is so fundamental that it undermines the franchise relationship may well depend on the facts of the particular case. . . . We believe that all of the relevant factors should be explored fully at trial before any final determination is made as to whether there was a contractual violation that undermined the franchise relationship.

Not every case necessarily requires a trial to settle the question of materiality. We can imagine a case in which the materiality of a particular violation is obvious.

On review of a summary judgment, the question is simply whether, on the record, there is a genuine issue of material fact as to the violation's significance.

Given the record in this case, we cannot say as a matter of law that El–Khoury's breach was material to the franchise relationship. Drawing all inferences in El–Khoury's favor, as we must, there is sufficient evidence to survive summary judgment on this issue.

## D. *Evidence of Immateriality*

El–Khoury presented several pieces of evidence tending to show that his underpayment of California sales tax was not important to the franchise relationship. First, Chevron's executives could not identify how the violation harmed Chevron. Second, Chevron deleted a specific reference to its right to audit tax records from the final Dealer Agreements. Third, El–Khoury remedied his tax-law violation.

### 1. *Testimony from Chevron's Executives*

El–Khoury deposed several of Chevron's executives and asked all of them what harm Chevron suffered due to El–Khoury's breach. None of those witnesses could identify a particular harm. Several responded that they "did not know" what harm Chevron would suffer from a violation like El–Khoury's. One of Chevron's executives went further and testified that a failure like El–Khoury's would be "between the Dealer and the state."

On the other hand, Chevron presented testimony from executives who testified that a franchisee's failure to pay all state sales tax when due could harm the company's public reputation. That may be so. However, at summary judgment, all inferences must be drawn in favor of the non-moving party.

### 2. *The Earlier Drafts of the Dealer Agreements*

■ As a preliminary matter, the district court decided that it could not consid-

er the earlier drafts of the Dealer Agreements because of the parol evidence rule. We note, first, that the parol evidence rule is a doctrine of contract law, not of evidence law. *Chavez v. Dir., Office of Workers Comp. Programs,* 961 F.2d 1409, 1413 (9th Cir.1992).

 Generally, extrinsic evidence cannot be used to contradict the terms of an integrated unambiguous written agreement. *See Gumport v. AT & T Techs., Inc. (In re Transcon Lines),* 89 F.3d 559, 568 (9th Cir.1996); *Wilson Arlington Co. v. Prudential Ins. Co. of Am.,* 912 F.2d 366, 370 (9th Cir.1990). However, El–Khoury sought to introduce the earlier agreements not to contradict the terms of the agreement but, instead, to shed light on the parties' intent as to the importance of a sales-tax violation to their franchise relationship. The parol evidence rule does not bar consideration of the earlier drafts of the contract for that purpose. *See* 3 Arthur L. Corbin, Corbin on Contracts § 576, at 384 (West 1960) (stating that the parol evidence rule does not bar evidentiary consideration of earlier draft agreements in deciding issues other than the terms of the agreement).

In other words, we consider the earlier agreements not in deciding whether Chevron had a right to audit tax records, but only in deciding whether Chevron thought that right was so important that it must be spelled out separately in the Dealer Agreements. Of course, many inferences could be drawn from Chevron's elimination of the provision. However, drawing all inferences in El–Khoury's favor, a jury could conclude that Chevron agreed to delete the mention of tax records because it did not think that tax compliance was important to the franchise relationship.

### 3. *El–Khoury's Tax Payment*

The district court did not consider the fact that El–Khoury paid the sales-tax deficiency because it reasoned that El–Khoury had no "right to cure" his violation under the PMPA. Whether El–Khoury had such a statutory right is a question that we need not, and do not, decide.

But the fact that El–Khoury eventually paid the tax and returned to a status of good standing with the state authorities is material to analyzing how important the sales-tax violation was to the franchise relationship. In other words, El Khoury's belated compliance with state sales-tax law is relevant to the materiality of the breach.

The facts that El–Khoury eventually paid all the sales tax due, that one of Chevron's executives testified that the issue in such a circumstance would be "between the Dealer and the state" rather than between the Dealer and Chevron, and that Chevron agreed to remove a proposed provision from its Dealer Agreements that had given special attention to tax returns and schedules—taken together—create a genuine issue of fact about the importance to the franchise relationship of El–Khoury's breach.

REVERSED and REMANDED.