In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2065

EMMANUEL JOSEPH,

*Plaintiff-Appellant*,

*v.*

SASAFRASNET, LLC, a Wisconsin
limited liability company,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:11-cv-00402—**Harry D. Leinenweber**, *Judge*.

ARGUED OCTOBER 26, 2011—DECIDED JULY 26, 2012

Before RIPPLE and HAMILTON, *Circuit Judges*, and
MYERSCOUGH, *District Judge*.[*]

RIPPLE, *Circuit Judge*. Emmanuel Joseph operates a
British Petroleum service station franchise in Chicago,
Illinois. Sasafrasnet, LLC, is Mr. Joseph's franchisor. On

_____

[*] The Honorable Sue E. Myerscough of the Central District
of Illinois, sitting by designation.

November 1, 2010, Sasafrasnet provided Mr. Joseph with written notification that the franchise agreement would terminate in ninety days. Mr. Joseph then initiated this action in which he alleges that Sasafrasnet's termination of his franchise would violate the Petroleum Marketing Practices Act ("PMPA" or the "Act"), 15 U.S.C. § 2801 et seq. The district court denied Mr. Joseph's motion for a preliminary injunction to prevent the termination.[1] Mr. Joseph now appeals that determination.[2] Because we believe that the statute requires additional findings by the district court, we reverse its judgment and remand for proceedings consistent with this opinion.

# I

## BACKGROUND

### A. Facts

Although Mr. Joseph and Sasafrasnet are the current parties to the franchise agreement, neither originally was involved with the station at issue. BP Products North America, Inc. ("BP Products") was the station's original franchisor. BP Products also owned the station's premises. Mr. Joseph purchased the franchise from the previous franchisee in May 2006 for $400,000. In conjunction with

---

[1] The district court's jurisdiction was premised upon 28 U.S.C. § 1331.

[2] We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

this purchase, Mr. Joseph entered into a Dealer Lease and Supply Agreement ("DLSA") with BP Products.[3] In March 2009, Sasafrasnet purchased BP Products's interest in the land and assumed its obligations under the DLSA, thereby becoming Mr. Joseph's lessor and franchisor.

The DLSA functions both as a lease agreement and as a supply contract. It sets a monthly rent for the premises and contemplates that Mr. Joseph will "act as a reseller of BP's trademarked motor fuels, motor oils and other products to the motoring public."[4] Sasafrasnet[5] is required to "deliver branded motor fuels to" the station.[6] Mr. Joseph, in turn, is obligated

> to establish an account with a financial institu-
> tion, on terms acceptable to [Sasafrasnet], that
> provides [electronic funds transfer ("EFT")] ser-
> vices and to authorize [Sasafrasnet] to initiate
> certain transfers of funds between that account
> and designated accounts of [Sasafrasnet] for pay-

---

[3] The original term of the DLSA was from May 1, 2006, to April 30, 2009.

[4] R.1-2 at 3 (DLSA 1).

[5] Because BP Products was the franchisor at the time the DLSA was entered into, the agreement does not mention Sasafrasnet. We substitute Sasafrasnet for BP Products in setting out the DLSA's obligations to reflect the parties' current contractual obligations.

[6] R.1-3 at 1 (DLSA 3).

ment of any and all amounts due to [Sasafrasnet]
under [the DLSA].[7]

The DLSA contains a provision authorizing Sasafrasnet
to terminate the franchise if Mr. Joseph "fail[s] . . . to
make payment according to [the] EFT policy causing a
draft to be dishonored for nonsufficient or uncollected
funds" more than once within a twelve-month period.[8]

   Sasafrasnet is not obligated to extend credit to
Mr. Joseph. However, the DLSA indicates that Sasafrasnet
would do so if Mr. Joseph submitted a $40,000 deposit.
Although Mr. Joseph had only deposited $10,000,[9]

---

[7]  *Id.* at 2 (DLSA 4).

[8]  *Id.*

[9]  In the district court, Mr. Joseph contended that he had
deposited $40,000 with BP Products before Sasafrasnet became
his franchisor. R.4-1 at 4. Sasafrasnet, however, asserted that
Mr. Joseph had deposited only $10,000 with BP Products
and that Sasafrasnet had attempted to obtain the difference
after it became the franchisor. R.7-1 at 2 (Payne Decl.). At the
hearing before the district court, Mr. Joseph admitted that he
paid only $10,000 toward the deposit when he signed the
DLSA. R.22 at 35. In response to questions posed by the
district court, however, Mr. Joseph testified that he had
"believe[d]" that the rest of the deposit was included in the
price he paid the previous franchisee. *Id.* at 39.

   In its findings of fact, the district court specifically found
that Sasafrasnet "holds a $10,000 security deposit." R.16 at 3.
Mr. Joseph does not assert that this finding is clearly erroneous.

(continued...)

Sasafrasnet did in fact deliver fuel to Mr. Joseph's station before collecting payment via EFT.

In June 2009, shortly after Sasafrasnet became Mr. Joseph's franchisor, an EFT from Mr. Joseph's account for a fuel delivery was returned for non-sufficient funds ("NSF"). Three more EFTs were returned NSF over the next three weeks. Mr. Joseph then made his payments as they came due until March 2010, when three more EFTs from Mr. Joseph's account were returned NSF. Thus, in the first year of Sasafrasnet's relationship with its new franchisee, Mr. Joseph had repeated payment problems in two different months.[10] Mr. Joseph acknowledges that he had "cross-collateralized a few of [his] businesses" and that, when certain "deals" pertaining to another business "went south," the bank began "sweeping" his account, leaving it without sufficient funds to satisfy the EFTs that Sasafrasnet would be initiating.[11] He admits that this situation was the result of "a mistake [he made] that repeated itself over the course of a year."[12]

---

[9]  (...continued)
Because there is no indication that this finding was clearly erroneous, we need not consider this dispute further.

[10] The district court found that there were seven NSFs in 2009. The district court obviously was referring to the period from June 2009 to March 2010 rather than calendar year 2009. *See* Appellee's Br. 5 n.3.

[11] R.22 at 13.

[12] *Id.* at 17.

He testified, however, that he "would always give them the money the next day or the day after."[13]

In March 2010, after Mr. Joseph's second round of NSFs, Sasafrasnet began to require that Mr. Joseph pay for his fuel before it was delivered. Nevertheless, as the district court found, this method of payment was not ideal for Sasafrasnet.[14] Therefore, in a letter dated May 7, 2010, Sasafrasnet indicated that it would allow Mr. Joseph to resume paying for deliveries by EFT within three days of delivery. The letter stated that Mr. Joseph would be required to pay a $2,500 penalty for any subsequent NSF. It also indicated that Mr. Joseph would be returned to pre-pay status if he incurred two more NSFs. Mr. Joseph signed the letter, indicating that he "agree[d]" to its terms.[15]

On July 8, 2010, Mr. Joseph informed Sasafrasnet that he was changing banks and that future EFTs should be taken from the new account, but he admits that he "failed to give Sasafrasnet adequate notice of [his] change of bank accounts."[16] Consequently, Sasafrasnet debited the old account on July 8, and the EFT was returned NSF. On July 12, Sasafrasnet again debited the old account for this invoice, and the draft once more was rejected as NSF. The district court found, however, that this NSF

---

[13] *Id.* at 24.

[14] *See* R.16 at 3-4.

[15] R.1-7 at 2.

[16] Appellant's Br. 4-5.

was the fault of Sasafrasnet because it "access[ed] the wrong bank account."[17] On July 15, yet another EFT was returned NSF, this time from Mr. Joseph's new account. Mr. Joseph contends that this last NSF was the result of "mutual mistakes."[18] He admits that these NSFs resulted, in part, from his failure to move money into the new account. Mr. Joseph puts part of the blame on Sasafrasnet, though, because it continued to deposit credit card revenues into the old account after it was on notice of the new account.

On July 19, the parties agreed that Mr. Joseph could rectify these NSFs by paying the total amount due in person by noon the next day. Mr. Joseph was late for this deadline, arriving to pay at 2:00 p.m. Mr. Joseph then paid the amounts due, plus the $5,000 penalty for the two NSFs that were, in Sasafrasnet's view, his fault.

By this time, Mr. Joseph had incurred ten NSFs. All but one of the NSFs were for amounts over $20,000, and three were for amounts over $45,000.[19] On July 30, 2010, Sasafrasnet gave Mr. Joseph ninety days' notice that it was terminating his franchise. Sasafrasnet later deter-

---

[17] R.16 at 2. Although the district court did not indicate explicitly that it was the second NSF in July 2010 that was the one that was Sasafrasnet's fault, Sasafrasnet had admitted during the district court proceedings that this NSF resulted from it "incorrectly submitt[ing]" the EFT to the old account. R.7 at 6 n.3; *accord* Appellee's Br. 6 n.4.

[18] Appellant's Br. 5.

[19] R.7-2.

mined that this notification did not comply with the notice requirements in the PMPA, and it withdrew the notification. In November 2010, Sasafrasnet reissued the ninety-day notice of termination. It listed the July 2010 NSFs and Mr. Joseph's failing scores on a mystery shopper inspection[20] as its bases for termination.

## B. District Court Proceedings

Shortly before the termination was to become effective, Mr. Joseph filed this action under the PMPA in the United States District Court for the Northern District of Illinois and moved for a preliminary injunction to prevent Sasafrasnet from terminating the franchise. After holding a hearing, the district court denied the motion. It concluded that late payments are a per se reasonable basis to terminate a franchise under the PMPA. On that basis, it concluded that Mr. Joseph could not meet the standard established by the PMPA for preliminary relief. The court did find, however, that the balance of hardships favored Mr. Joseph because he was poised to lose a $400,000 investment.

---

[20] On appeal, the parties note that the mystery shopper inspection was a basis that Sasafrasnet gave for the termination, and they dispute some of the facts relevant to that legal theory. However, they do not analyze the issue on its merits in any detail. Mr. Joseph raised the issue in the district court, but the district court did not reach it. The district court may have to address this issue on remand. *See infra* note 38. We pretermit any further discussion of this issue.

Thereafter, the district court entered an "Injunction Pending Appeal" on the condition that Mr. Joseph post a $100,000 appeal bond. By a stipulation of the parties, the district court further ordered Mr. Joseph to deliver $30,000 in additional fuel security to Sasafrasnet, bringing the total deposit to $40,000. At oral argument, Mr. Joseph's counsel informed us that Mr. Joseph continues to operate the station.

## II

## DISCUSSION

### A. Standard of Review

In actions under the PMPA,

the [district] court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be

> imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. § 2805(b)(2).

"The franchisee's burden of proof for receiving a preliminary injunction under the PMPA is not a heavy one." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir. 1984). "The franchisee need not . . . establish that it would be irreparably harmed in the absence of an injunction." *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 905 (7th Cir. 1997). Furthermore, unlike Federal Rule of Civil Procedure 65, "the PMPA requires only that a franchisee show a reasonable chance of success on the merits," not "a strong or reasonable likelihood of success." *Moody*, 734 F.2d at 1216.[21]

Our review of a district court's decision to grant or to deny preliminary relief under the PMPA is "narrow"; we "will not reverse a district court's grant or denial of a preliminary injunction absent a clear abuse of discretion by the district court." *Id.* at 1217. We review questions of law de novo and questions of fact for clear error. *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Locomotive Eng'rs*, 367 F.3d 675, 678 (7th Cir. 2004).

---

[21] If the matter were to proceed to trial, however, Sasafrasnet would "bear the burden of going forward with evidence to establish as an affirmative defense that such termination" was permitted by the PMPA. 15 U.S.C. § 2805(c); *see infra* § II.C.

**B. Grounds for Termination**

In its November 2010 letter, Sasafrasnet informed Mr. Joseph that it was terminating his franchise because he had "failed to pay Sasafrasnet all sums due under the [DLSA] in a timely manner," noting particularly the July 2010 NSFs.[22] Specifically, Sasafrasnet indicated that it was resting its decision to terminate Mr. Joseph's franchise, in part, upon 15 U.S.C. § 2802(b)(2)(C).[23] This provision of the PMPA authorizes a franchisor to terminate a franchise based on:

> The occurrence of *an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable*, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence[ within a prescribed period.]

15 U.S.C. § 2802(b)(2)(C) (emphasis added). Sasafrasnet also invoked a related provision of the PMPA, which defines the portion of § 2802(b)(2)(C) that we have italicized in the preceding quotation. This subsection provides:

---

[22] R.1-9 at 2.

[23] Sasafrasnet invoked other provisions of the PMPA in this letter as well. The district court did not address those grounds in its order. Accordingly, neither do we consider the applicability of those provisions.

As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as—

. . .

(8) *failure* by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

. . . .

15 U.S.C. § 2802(c)(8) (emphasis added). The PMPA explicitly excludes from the definition of "failure":

(A) any failure which is only technical or unimportant to the franchise relationship;

(B) any failure for a cause beyond the reasonable control of the franchisee; or

(C) any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

15 U.S.C. § 2801(13).

Sasafrasnet contends that the occurrence of an event listed in § 2802(c) provides a franchisor with a basis for terminating a franchise that satisfies § 2802(b)(2)(C)'s reasonableness requirement as a matter of law. Mr. Joseph disagrees with this interpretation and asserts that § 2802(b)(2)(C) requires an independent judicial determination of the reasonableness of a termination deci-

sion, even if an event listed in § 2802(c) has occurred. The courts of appeals have reached differing conclusions on this question. On one side is the Sixth Circuit, which has held that a court "must scrutinize the reasonableness of terminations even when an event enumerated in § 2802(c) has occurred." *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509, 1512 (6th Cir. 1989). Every other circuit court that has addressed the matter has held that the occurrence of an event listed in § 2802(c) provides a franchisor with a per se reasonable basis for terminating a franchise. *See Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 377 (4th Cir. 1992) (per curiam); *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 26 (1st Cir. 1987); *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1573 (11th Cir. 1987); *Atl. Richfield Co. v. Guerami*, 820 F.2d 280, 283 (9th Cir. 1987); *Russo v. Texaco, Inc.*, 808 F.2d 221, 225 (2d Cir. 1986); *Lugar v. Texaco, Inc.*, 755 F.2d 53, 57-58 n.3 (3d Cir. 1985). Nevertheless, these courts have recognized that the definition of "failure" in § 2801(13) incorporates "[a] specific, limited reasonableness requirement" into the grounds listed in § 2802(c) that employ that statutory term. *Hinkleman*, 962 F.2d at 377; *accord Chevron U.S.A. Inc. v. El-Khoury*, 285 F.3d 1159, 1163-64 (9th Cir. 2002); *Lugar*, 755 F.2d at 58 n.3.[24]

---

[24] In *Sun Refining & Marketing Co. v. Rago*, 741 F.2d 670 (3d Cir. 1984), the Third Circuit applied 15 U.S.C. § 2801(13) to determine whether the franchisee had committed a "failure" within the meaning of the PMPA. *Id.* at 673. In doing so, however, it stated that it would not "construe § 2802(c) as a per se termina-

(continued...)

We have not determined definitively whether a termination based on an event listed in § 2802(c) is per se reasonable, although we have indicated an inclination to accept the analysis of the majority of our sister circuits. *See Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 725 (7th Cir. 2010). Today, we make clear that the occurrence of an event listed in § 2802(c) justifies, as a matter of law, a franchisor's decision to terminate a franchise under § 2802(b)(2)(C). In our view, the plain language of the PMPA "unambiguously permits termination of a petroleum franchise agreement upon failure of the franchisee to timely adhere to payment obligations." *Hinkleman*, 962 F.2d at 377. Of course, if the franchisor seeks to terminate the franchise under § 2802(b)(2)(C) because of the occurrence of an event *other* than those listed in § 2802(c), judicial scrutiny of the reasonableness of the termination is required. *See Moody*, 734 F.2d at 1217.

---

[24] (...continued)

tion rule favoring franchisors." *Id.* The Third Circuit since has made clear that *Rago* was concerned with the limited reasonableness requirement contained in 15 U.S.C. § 2801(13) and not the general reasonableness standard contained in 15 U.S.C. § 2802(b)(2)(C). *See Patel v. Sun Co.*, 141 F.3d 447, 458 (3d Cir. 1998); *Lugar v. Texaco, Inc.*, 755 F.2d 53, 58 n.3 (3d Cir. 1985); *see also Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 724-25 (7th Cir. 2010) (noting that the Third Circuit "backed off" its strong language from *Rago* in *Lugar*).

## C. Application

Having determined that the events listed in § 2802(c) constitute per se reasonable bases for a franchisor to terminate a franchise, we now must consider whether the district court abused its discretion in concluding that Mr. Joseph's NSFs satisfied 15 U.S.C. § 2802(c)(8).[25] We first pause to examine the language of § 2802(c)(8) in context and the governing burden of proof.

A franchisor may invoke properly § 2802(c)(8) only if there is a "*failure* by the franchisee to pay to the franchisor in a *timely* manner when due all sums to which the franchisor is legally entitled." § 2802(c)(8) (emphasis added); *see El-Khoury*, 285 F.3d at 1163-64; *Hinkleman*, 962 F.2d at 377; *Lugar*, 755 F.2d at 58 n.3. An event is not a "failure" if it is "only technical or unimportant to the franchise relationship" or if it is "for a cause beyond the reasonable control of the franchisee." § 2801(13)(A)-(B).

At the preliminary injunction stage, Mr. Joseph had the burden of "show[ing that] . . . there exist[ed] sufficiently serious questions going to the merits to make such questions a fair ground for litigation." 15 U.S.C. § 2805(b)(2)(A)(ii). Should the matter proceed to trial, Sasafrasnet would "bear the burden of going forward with evidence to establish as an affirmative defense that such termination . . . was permitted under section 2802(b)." § 2805(c). Consequently, in concrete terms,

---

[25] There is no dispute that the late payments in July 2010 occurred within 120 days of the November 2010 termination letter. *See* 15 U.S.C. § 2802(b)(2)(C)(i).

Mr. Joseph's burden at the preliminary injunction stage
was to show that "there is a 'reasonable chance' that
[Sasafrasnet] will be unable to prove that the termina-
tion was permissible under the Act." *Khorenian v. Union
Oil Co. of Cal.*, 761 F.2d 533, 535-36 (9th Cir. 1985) (quoting
*Moody*, 734 F.2d at 1216).

Our inquiry requires that we focus on two terms in
this statutory provision—"failure" and "timely." We
shall address each in turn.

### 1.

Mr. Joseph did not address explicitly the statutory
definition of "failure" during the proceedings before the
district court.[26] Rather, Mr. Joseph took as the focus of
his argument that, even if Sasafrasnet could invoke prop-
erly § 2802(c)(8), there were serious questions about
whether the termination was reasonable for purposes
of § 2802(b)(2)(C).[27] As we explained above, however, this

---

[26] The only argument Mr. Joseph advanced about why prelimi-
nary injunctive relief would be appropriate if § 2802(c)(8) were
a per se termination rule was by focusing on the "timely
manner" portion of the standard, not the "failure" portion.
*See* R.4-1 at 6 ("Even if the enumerated events are deemed 'per
se unreasonable,' [§] 2802(c)(8) provides that 'failure by the
franchisee to pay to the franchisor *in a timely manner . . .*
when due all sums to which the franchisor is legally enti-
tled[.]'" (emphasis in original)).

[27] After setting out the relevant provisions in § 2802(b)(2)(C) and
§ 2802(c)(8), Mr. Joseph stated: "The issue is, if one of the

(continued...)

argument, which rests on the view that the grounds for termination set forth in § 2802(c)(8) require an independent judicial inquiry into the reasonableness of the particular termination, fails as a matter of law. Section 2802(c)(8) provides a franchisor with a per se reasonable basis to terminate a franchise for purposes of § 2802(b)(2)(C).

As we also have noted, however, our sister circuits have determined further that there is "[a] specific, limited reasonableness requirement . . . incorporated into the statute through section 2801(13)." *Hinkleman*, 962 F.2d at 377. Although Mr. Joseph never cited § 2801(13), he did argue facts that might be construed as supporting the contention that the definition of "failure" set forth in § 2801(13) was not met. Specifically, he argued facts that might support a determination that the failure was "only technical or unimportant to the franchise relationship"[28] or that the failure was "for a cause beyond [his] reasonable control."[29] And, notably, Sasafrasnet's memo-

---

[27] (...continued)

12 enumerated events [in §] 2802(c) is the basis for the termination or nonrenewal of a franchise relationship[,] is the termination 'per se reasonable[,'] *or* may the court look to the circumstances to determine whether the termination was reasonable?" R.4-1 at 6 (emphasis added).

[28] *See* R.4-2 at 1 (arguing that his late payments were "*technical* in nature" (emphasis added)).

[29] *See* R.4-1 at 3 (arguing that the second NSF in July 2010 "was
(continued...)

randum in opposition to Mr. Joseph's motion for prelimi-
nary relief stated that the payments were not "'unimpor-
tant,'" as that term is used in § 2801(13).[30] Nevertheless,
the district court, in focusing on the phrase "failure . . . to
pay . . . in a timely manner" of § 2802(c)(8), never
referred explicitly to the statutory definition of "fail-
ure" and never made any findings as to whether this
standard was satisfied.

We believe it best that the district court revisit this
question and address explicitly the elements of the
term "failure" set forth in § 2801(13). Two points are
particularly deserving of the district court's attention.
First, the district court should determine which of the
July 2010 NSFs were within Mr. Joseph's reasonable
control. Although Mr. Joseph appears to concede that
the first NSF was within his reasonable control,[31]
and although the second NSF in July appears to be at-

---

[29] (...continued)
the sole fault of [Sasafrasnet, which] inadvertently drafted
the former bank account").

[30] R.7 at 11-12 (quoting the discussion of § 2801(13)(A) in
*Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 376-77 (4th Cir. 1992)
(per curiam), and asserting that "[t]he same logic applies to
this case").

[31] *See* Appellant's Br. 4-5 (stating that this NSF occurred
"because [Mr.] Joseph had failed to give Sasafrasnet adequate
notice of [his] change of bank accounts").

tributable to Sasafrasnet,[32] the proper treatment of the third NSF in July 2010 is less clear. Mr. Joseph asserts that this NSF was a "mutual mistake[]." Appellant's Br. 5. This characterization results from his belief that Sasafrasnet's failure to deposit credit card revenues into his new account contributed to this NSF and that "[t]he problem was further exacerbated by the fact that [he] neglected to transfer[] the remaining funds in the old account to the new one." R.4-1 at 3. The district court did not address this contention.

The second point that the district court should consider is whether the July 2010 NSFs that were within Mr. Joseph's reasonable control were "only technical or unimportant to the franchise relationship." § 2801(13)(A). In making this determination, the district court would have to evaluate the July NSFs that were attributable to Mr. Joseph in the context of the historical relationship of the parties.[33] These determinations should

---

[32] *See supra* note 17.

[33] *See Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1221 (7th Cir. 1982) (stating that § 2802(c)(8) is "intended to cover the potential problem of repeated lateness"); S. Rep. No. 95-731, at 33-34 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 892 ("If the franchisor waives the exercise of termination or non-renewal rights based upon a specific occurrence of an event, the franchisor may not thereafter base termination or non-renewal upon the specific occurrence. However, the time limitations are not intended to stop a franchisor from exercising termination or non-renewal rights based upon a future event which constitutes a ground for termination or non-renewal, *even if*

(continued...)

be made in the first instance by the district court.


**2.**

Mr. Joseph also submits that "[t]he question of what constitutes payment 'in a timely manner[]' . . . is 'intended to permit evaluation of nonpayment or late payments in view of prevailing commercial or industry trade practices.'" *Clinkscales*, 831 F.2d at 1573 n.19 (quoting S. Rep. No. 95-731, at 38 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 896). We have previously endorsed this standard, *see Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1221 (7th Cir. 1982), and we continue to believe that it reflects accurately the statutory intent of § 2802(c)(8). However, the district court did not consider this standard expressly in setting forth its findings of facts and conclusions of law. Generally, "a district court abuses its discretion in issuing a preliminary injunction when it applies an incorrect legal standard in determining the likelihood of success on the merits." *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 326 (7th Cir. 1984). However, this rule is not absolute. For instance, we have held that where the "evidence before this court [is] more than

---

[33] (...continued)
*such future event is a repeat occurrence of an event with respect to which the previous exercise of termination or non-renewal rights was waived*." (emphasis added)), *cited with approval in Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1573 n.19 (11th Cir. 1987), *and Brach*, 677 F.2d at 1216 n.3.

sufficient to mandate a [particular] finding" on an issue at the preliminary injunction stage, we need not remand for further consideration of that issue. *See Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153, 1157 (7th Cir. 1984); *accord Ezell v. City of Chicago*, 651 F.3d 684, 710 (7th Cir. 2011) (reversing a district court's denial of pre-liminary injunction and remanding for entry of preliminary injunction where we determined that "the plaintiffs' . . . claim ha[d] a strong likelihood of success on the merits").

Here, Mr. Joseph had the burden of demonstrating, in support of his motion for a preliminary injunction, that Sasafrasnet would not be able to establish at trial that the payments were untimely according to the practice of the industry. He simply did not carry that burden. Assuming, arguendo, that the district court determines that it was reasonable for Sasafrasnet to regard Mr. Joseph's late payments as "failure[s]," there is no evidence of record that would have permitted the district court to make a finding that the payments were timely. The record before us, at this stage of the proceedings, makes it abun-dantly clear that, for a franchisee with a payment record of this caliber, the July 2010 NSFs constituted untimely payments within the meaning of § 2802(c)(8). Mr. Joseph has offered no evidence to show that Sasafrasnet treated him any differently from any other franchisee in the industry with a similar record.

For its part, Sasafrasnet has submitted evidence showing that it had no institutional experience with a

franchisee with such a record.[34] After Mr. Joseph experienced his second bout of repeated NSFs within the first year of the parties' business relationship, Sasafrasnet placed him on pre-pay status. This letter put him on notice that Sasafrasnet was not in the practice of tolerating late payments. Sasafrasnet reiterated this point in May 2010, when it took Mr. Joseph off pre-pay status on the condition that he pay a stiff monetary penalty for any future late payment. Therefore, to the extent that the experience of the franchisor may be considered as some evidence of industry practice,[35] the record simply shows that this situation was extraordinary and did not comport with Sasafrasnet's regular practice.

For the same reason, Mr. Joseph cannot claim that he lacked "notice that timely payment would be required in the future," *Sun Ref. & Mktg. Co. v. Rago*, 741 F.2d 670, 674 (3d Cir. 1984), because "he had been on notice that his past practices of late payments would not be condoned," *Pendleton*, 889 F.2d at 1512. Again, to the extent that the franchisor's experience may be said to be reflective of industry experience, there is no evidence

---

[34] Sasafrasnet's president testified that Mr. Joseph was the only franchisee who had payments returned NSF. *See* R.22 at 73-74.

[35] *Cf. Rago*, 741 F.2d at 674 (noting that a franchisor's "repeated acceptance of late payments over a period of years would suggest that timely payment was not its prevailing trade practice . . . . absent any notice that timely payment would be required in the future); *accord Clinkscales*, 831 F.2d at 1573.

that Mr. Joseph was given inadequate notice of Sasafrasnet's expectations.

Mr. Joseph also makes the argument that his payments cannot be considered untimely because "the parties entered into a written agreement regarding how future late payments would be dealt with" and that he "was compliant with the terms of [that] agreement." Appellant's Br. 16. Although Mr. Joseph asserts that this agreement amended the DLSA,[36] his more basic point appears to be that this letter "contemplates a continuing relation-

---

[36] There is no merit to this contention. At its core, this argument is premised on the assumption that the DLSA "did not give the Sasafrasnet [sic] the right to unilaterally impose monetary sanctions in the event that an EFT was dishonored." Appellant's Br. 17. "Consequently," Mr. Joseph asserts, "the changes Sasafrasnet wished to make to its credit policy requiring a 'penalty payment'[] required the consent of [Mr.] Joseph." *Id.* In his view, the letter contains an implicit promise not to cancel his franchise if Sasafrasnet collected the penalties for late payment, with said promise being the consideration that Sasafrasnet would have had to give him to make the agreement binding as a matter of contract law.

The argument fails in its foundational assumption: that Sasafrasnet could not require penalty payments without Mr. Joseph's consent. The DLSA provides that "[Sasafrasnet] has the right to impose a service and late payment charge for each check and/or EFT that is dishonored for nonsufficient or uncollected funds, whether or not subsequently paid by [Mr. Joseph]." R.1-3 at 2 (DLSA 4). Therefore, the May 2010 letter did not amend the DLSA.

ship and not a termination of the franchise after the late payment." *Id.* at 19.

This characterization conflicts with the terms of the DLSA, which is, of course, the contract that governs Mr. Joseph's franchise. The DLSA provides:

> No failure to act on an incident of breach, and no course of dealing[,] will be construed as the waiver of the right to act. . . . Any failure of [Sasafrasnet] to enforce rights or seek remedies upon any default of [Mr. Joseph] with respect to any of the obligations of [Mr. Joseph] hereunder, will not prejudice or affect the rights or remedies of [Sasafrasnet] in the event of any subsequent default of [Mr. Joseph].

R.1-5 at 3 (DLSA 15). It further provides:

> More than one incident, within a 12 month period, of failure by [Mr. Joseph] to make payment according to [the] EFT policy causing a draft to be dishonored for nonsufficient or uncollected funds . . . entitles [Sasafrasnet] to suspend deliveries, impose other payment or prepay terms, and/or terminate or nonrenew [the DLSA], in addition to exercising any other rights [Sasafrasnet] may have under [the DLSA] at law or in equity or under [Sasafrasnet]'s then current Credit Policy.

R.1-3 at 2 (DLSA 4); *see also id.* ("[Sasafrasnet] has the right to impose a service and late payment charge for each check and/or EFT that is dishonored for nonsufficient or uncollected funds, whether or not subsequently paid by [Mr. Joseph].").

This language makes clear that Sasafrasnet's decision to impose penalties for future NSFs was not an implicit waiver of its right to terminate Mr. Joseph's franchise in the event of such NSFs. The DLSA put Mr. Joseph on notice that Sasafrasnet could "impose . . . payment or prepay terms[] *and/or* terminate or nonrenew th[e DLSA]" if Mr. Joseph incurred two NSFs within one year. *Id.* (emphasis added).[37] It further provided that Sasafrasnet's decision to seek certain remedies would not prejudice Sasafrasnet's right to seek other appropriate remedies. Therefore, Mr. Joseph was on notice that Sasafrasnet would not tolerate late payments and that Sasafrasnet retained the discretion to determine whether it would seek to terminate the franchise under the rights afforded to it by the DLSA and PMPA if and when Mr. Joseph experienced future NSFs. *See Clinkscales*, 831 F.2d at 1573 n.19 (explaining that the PMPA allows termination based on the repeat occurrence of an event even if the franchisor did not seek termination based on the previous occurrences); *Rago*, 741 F.2d at 674 (same).

---

[37] Of course, Sasafrasnet could not invoke this provision to terminate Mr. Joseph's franchise unless that termination was authorized by the PMPA. *See* 15 U.S.C. § 2802(a)(1). Whether the PMPA would permit termination in the circumstances described by the DLSA is an altogether different question than whether such provisions put Mr. Joseph on notice of Sasafrasnet's trade practices.

## Conclusion

For the foregoing reasons, we reverse the judgment of the district court and remand[38] the case for proceedings consistent with this opinion.

REVERSED and REMANDED

---

[38] If, on remand, the district court determines that Mr. Joseph would be entitled to preliminary injunctive relief with respect to § 2802(c)(8), it will have to consider whether Mr. Joseph has established as well that Sasafrasnet will not prevail on its independent argument that it is entitled to terminate the franchise because of the failed mystery shopper inspection.